**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BEAR VALLEY MUTUAL WATER
COMPANY; BIG BEAR MUNICIPAL
WATER DISTRICT; CITY OF
REDLANDS; CITY OF RIVERSIDE;
CITY OF SAN BERNARDINO
MUNICIPAL WATER DEPARTMENT;
EAST VALLEY WATER DISTRICT;
RIVERSIDE COUNTY FLOOD
CONTROL AND WATER
CONSERVATION DISTRICT; SAN
BERNARDINO VALLEY MUNICIPAL
WATER DISTRICT; SAN BERNARDINO
VALLEY WATER CONSERVATION
DISTRICT; WESTERN MUNICIPAL
WATER DISTRICT; WEST VALLEY
WATER DISTRICT; YUCAIPA VALLEY
WATER DISTRICT,
            *Plaintiffs-Appellants*,

v.

SALLY JEWELL, Secretary of the
United States Department of the
Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR;
DANIEL M. ASHE, Director, United
States Fish and Wildlife Service;
UNITED STATES FISH AND WILDLIFE
SERVICE,
            *Defendants-Appellees*,

No. 12-57297

D.C. No.
8:11-cv- 01263-
JVS-AN

OPINION

CALIFORNIA TROUT, INC.; CENTER
FOR BIOLOGICAL DIVERSITY; SAN
BERNARDINO AUDUBON SOCIETY;
SIERRA CLUB,
    *Intervenor-Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
March 5, 2015 – Pasadena, California

Filed June 25, 2015

Before: Harry Pregerson, Barrington D. Parker, Jr.[*],
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Parker

---

 [*] The Honorable Barrington D. Parker, Jr., Senior Circuit Judge for the
U.S. Court of Appeals for the Second Circuit, sitting by designation.

## SUMMARY[**]

### Environmental Law

The panel affirmed the district court's summary judgment in favor of federal defendants in an action brought by plaintiff municipalities and water districts challenging a 2010 Final Rule designating areas for the threatened Santa Ana sucker as critical habitat.

In 2000, the United States Fish and Wildlife Service designated the sucker as a "threatened" species pursuant to the Endangered Species Act. In 1999, a coalition of parties developed the Western Riverside County Multiple Species Habitat Conservation Plan, a regional, multi-jurisdictional plan that encompassed nearly 1.26 million acres and provided participating agencies with a 75-year permit for the incidental taking of 146 protected species, including the sucker, in exchange for implementing conservation measures; the Service formally approved the Conservation Plan in 2004. In the 2010 Final Rule, the Service designated additional critical habitat within the Conservation Plan.

The district court held that the Service satisfied its statutory obligation to cooperate with state agencies, that the critical habitat designation was not arbitrary or capricious, and that any claims under the National Environmental Policy Act were barred by this court's decision in *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995), which held that the statute does not apply to critical habitat designations.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that section 2(c)(2) of the Endangered Species Act did not create an independent cause of action, and rejected appellants' argument that the Service violated the provision by failing to cooperate with State and local agencies on water resource issues.

The panel held that the critical habitat designation of land covered by the Conservation Plan was proper. Specifically, the panel affirmed the district court's holding that the Service's decision not to exclude land covered by the Conservation Plan was not subject to review. The panel also held that the Service's designation of lands included in the Conservation Plan was not arbitrary or capricious. The panel further held that the designation of habitat in areas covered by the Conservation Plan did not violate the Services's "No Surprises Rule," which provides that the Service may not require permittees to pay for additional conservation and mitigation measures absent unforeseen circumstances. The panel also held that appellants had adequate opportunity to comment on the Service's scientific citations.

The panel held that the Service's designation of critical habitat in unoccupied areas was proper.

The panel rejected appellants' claim that the Service violated the National Environmental Policy Act by failing to prepare an environmental impact statement in connection with its 2010 Final Rule because the Act does not apply to the designation of a critical habitat.

**COUNSEL**

Gregory K. Wilkinson (argued), Wendy Wang, Melissa Cushman, and Kira Johnson, Best Best & Krieger LLP, Riverside, California, for Plaintiffs-Appellants City of Riverside, Riverside County Flood Control and Water Conservation District, and Western Municipal Water District.

Jean Cihigoyenetche, Brunick, McElhaney & Kennedy, San Bernardino, California, for Plaintiff-Appellant East Valley Water District.

David G. Moore, Reid & Kellyer, Riverside, California, for Plaintiff-Appellant Bear Valley Mutual Water Company.

Daniel J. McHugh, Office of the City Attorney, Redlands, California, for Plaintiff-Appellant City of Redlands.

David R.E. Aladjem and M. Max Steinheimer, Downey Brand LLP, Sacramento, California, for Plaintiff-Appellant San Bernardino Valley Municipal Water District.

David L. Wysocki, Aklufi & Wysocki, Redlands, California, for Plaintiff-Appellant Yucaipa Valley Water District.

Gerald W. Eagans, Redwine & Sherrill, Riverside, California, for Plaintiff-Appellant West Valley Water District.

Gregory Priamos and Susan D. Wilson, Office of the City Attorney, Riverside, California, for Plaintiff-Appellant City of Riverside.

Wayne Lemieux, Lemieux & O'Neill, Thousand Oaks, California, for Plaintiff-Appellant Big Bear Municipal Water District.

David B. Cosgrove, Rutan & Tucker LLP, Costa Mesa, California, for Plaintiff-Appellant San Bernardino Valley Water Conservation District.

Andrew M. Hitchings, Somach Simmons & Dunn, Sacramento, California, for Plaintiff-Appellant City of San Bernardino Municipal Water Department.

Robert G. Dreher, Acting Assistant Attorney General, Andrea Gelatt, and Allen M. Brabender (argued), Attorneys, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Lynn Cox, Office of the Solicitor, United States Department of the Interior, for Federal Defendants-Appellees.

John Buse (argued) and D. Adam Lazar, Center for Biological Diversity, San Francisco, California, for Intervenor-Defendants-Appellees.

M. Reed Hopper and Anthony L. François, Pacific Legal Foundation, Sacramento, California, for Amicus Curiae Pacific Legal Foundation.

Michelle Ouellette, Ward H. Simmons, and Lucas I. Quass, Best Best & Krieger LLP, Riverside, California, for Amicus Curiae Western Riverside County Regional Conservation Authority.

Daniel J. O'Hanlon, Hanspetter Walter, Rebecca R. Akroyd, and Elizabeth L. Leeper, Kronick, Moskovitz, Tiedemann &

Girard, Sacramento, California; Marcia L. Scully, General Counsel, and Linus S. Masouredis, Chief Deputy General Counsel, The Metropolitan Water District of Southern California, for Amici Curiae Association of California Water Agencies and State Water Contractors, and the Metropolitan Water District of Southern California.

Frederic A. Fudacz, Robert D. Thornton, and Susan G. Meyer, Nossaman LLP, Irvine, California; John Krattli, County Counsel, and Michael L. Moore, Deputy Couty Counsel, Office of County Counsel, Los Angeles, California, for Amici Curiae Los Angeles County Flood Control District and the Main San Gabriel Basin Watermaster.

## OPINION

PARKER, Senior Circuit Judge:

The Santa Ana sucker (*Catostomus santaanae*) is a small freshwater fish native to several California rivers and streams, including the Santa Ana River.  In 2000, the United States Fish and Wildlife Service ("FWS"), after being sued by conservation groups, designated the sucker as a "threatened" species pursuant to the Endangered Species Act ("ESA"). In 2004, the FWS  promulgated a Final Rule designating particular areas as critical habitat for the sucker.  In a subsequent 2005 Final Rule and in a 2009 Proposed Rule, the FWS excluded certain  areas covered by local conservation plans from critical habitat designation.  But in a 2010 Final Rule, the FWS changed course and designated as critical habitat several thousand acres of land that had previously been excluded.

In August 2011, in response to this change, several municipalities and water districts sued the FWS, the Department of the Interior, and other federal officials, alleging, in essence, that the FWS (1) did not cooperate with the state in resolving water resource issues that arose from the critical habitat designation; (2) acted arbitrarily and capriciously in revising the critical habitat designation to include the previously excluded land; and (3) violated the National Environmental Policy Act ("NEPA") by failing to prepare an environmental impact statement prior to designation. Shortly thereafter, several conservation groups previously involved in the litigation to secure critical habitat designation for the sucker successfully moved to intervene.

The parties cross-moved for summary judgment. In October 2012, the United States District Court for the Central District of California (James V. Selna, J.) granted defendants summary judgment on all claims. The court held that the FWS satisfied its statutory obligation to cooperate with state agencies, that the critical habitat designation was not arbitrary or capricious, and that any claims under NEPA were barred by this Court's decision in *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995), which held that the statute does not apply to critical habitat designations. This appeal followed. For the reasons set forth, we AFFIRM the district court's judgment.

# BACKGROUND

## I.  Factual Background

### A.  The Santa Ana River

Appellants are municipalities and water districts that divert water from the Santa Ana River for various uses and conduct maintenance activities within its watershed.  The Santa Ana River travels through southwestern San Bernardino County and Riverside County, continues through Orange County, and flows into the Pacific Ocean between Newport Beach and Huntington Beach.  The Santa Ana River is prone to flooding; consequently, two dams—the Prado and the Seven Oaks Dam—work in tandem to assist with flood control.  The dams require ongoing maintenance work, some of which may be done in areas designated as critical habitat.

The Santa Ana River also serves as a source of water for its watershed communities.  Water rights are allocated to municipalities and water districts subject to two state court decisions, *Orange County Water District v. City of Chino et al.*, No. 117628 (Super. Ct. Orange County, CA Apr. 17, 1969) and *Western Municipal Water District of Riverside County et al v. East San Bernardino County Water District et al.*, No. 78426 (Super. Ct. Riverside County, CA Apr. 17, 1969).  In 2009, the California State Water Board granted the San Bernardino Valley Municipal Water District and the Western Municipal Water District permits to divert additional water captured by the Seven Oaks Dam "for beneficial uses."

**B. Local Conservation Plans and Partnerships**

In the late 1990s, two coalitions formed to develop conservation plans for the sucker. In 1998, the first coalition, consisting of the FWS, the United States Army Corps of Engineers, the Santa Ana Watershed Project Authority, and various local agencies, including several Appellants in this case, agreed to the Santa Ana Sucker Conservation Plan ("SASCP"). Under the SASCP, the FWS allowed permittees to incidentally "take" (*i.e.*, harm or kill) a limited number of suckers, in exchange for various conservation and mitigation measures. In 1999, a second coalition of 22 parties developed the Western Riverside County Multiple Species Habitat Conservation Plan ("MSHCP"), a regional, multi-jurisdictional plan that encompasses nearly 1.26 million acres and provides participating agencies with a 75 year permit for the incidental taking of 146 protected species, including the sucker, in exchange for implementing conservation measures. Several Appellants, including the City of Riverside and Riverside County Flood Control, are among the permittees covered by the MSHCP.

In 2004, the MSHCP was formally approved by the FWS. Under the terms of the Implementation Agreement ("MSHCP-IA"), the FWS stipulated that:

> [T]o the maximum extent allowable after public review and comment, in the event that a Critical Habitat determination is made for any Covered Species Adequately Conserved, and unless the [Service] finds that the MSHCP is not being implemented, lands within the boundaries of the MSHCP will not be designated as Critical Habitat.

Although the MSHCP continues to be implemented, the FWS, in the 2010 Final Rule, designated additional critical habitat within the MSHCP. A crucial issue on this appeal is whether, and to what extent, this stipulation binds the FWS's designation decisions.

## C.  History of Listing and Critical Habitat Designation

### 1.  1994-2003

Efforts to list the sucker as an endangered species date back to September 1994, when two conservation groups petitioned the FWS to consider the listing. When the FWS did not respond to the petition within the 90 days mandated by statute, the groups sued to compel a determination. In May 1996, the United States District Court for the Northern District of California found that the FWS violated the ESA and ordered the Service to make a preliminary determination as to the sucker's status. *See Cal. Trout v. Babbitt*, No. 95-cv-3961, Dkt. No. 30 (N.D. Cal. Nov. 7, 1995).

In July 1996, the FWS published a preliminary determination that a listing of the sucker could be warranted, but took no further action. 61 Fed. Reg. 36,021 (July 9, 1996). The district court then ordered the FWS to publish a proposed rule regarding listing, as required by the ESA. In March 1997, the FWS determined that while listing the sucker as endangered or threatened was warranted, other listing actions commanded higher priority. 62 Fed. Reg. 15,872 (Apr. 3, 1997). The conservation groups then filed a new lawsuit in response to which the district court set a schedule for the FWS to publish a proposed and final listing determination.

In April 2000, the FWS released a Final Listing Rule, listing the sucker as a "threatened" species. The FWS noted that the sucker had been eliminated from approximately 75% of its former native range, due to "habitat destruction, natural and human-induced changes in streamflows, urban development and related land-use practices, and the introduction of nonnative competitors and predators." 65 Fed. Reg. 19,686, 19,691 (Apr. 12, 2000). The FWS did not, however, designate critical habitat for the sucker in the 2000 Final Listing Rule on the ground that its "knowledge and understanding of the biological needs and environmental limitations of the Santa Ana sucker and the primary constituent elements of its habitat are insufficient to determine critical habitat for the fish." *Id.* at 19,696. In such circumstances, the ESA requires the FWS to conduct additional research and issue a final determination of critical habitat no later than two years after the proposed listing rule. 16 U.S.C. § 1533(b)(6)(C)(ii)(II).

The district court supervising the *California Trout* litigation retained jurisdiction to monitor the FWS's compliance with the statutory deadline. After the FWS failed to comply, the conservation groups amended their complaint and moved for summary judgment. The district court found the FWS in violation of the ESA and ordered a final critical habitat designation by February 2004. *Cal. Trout v. Norton*, No. 97-cv-3779, 2003 WL 23413688, at *5 (N.D. Cal. Feb. 26, 2003).

## 2. 2004 Final and Proposed Rules

In February 2004, the FWS concurrently issued identical proposed and final critical habitat designations. The 2004 Final Rule designated 21,129 acres of critical habitat in three

areas: the Santa Ana River (indicated as Unit 1, further divided into subunits 1A and 1B), the San Gabriel River (Unit 2), and the Big Tujunga Creek (Unit 3).  The 2004 Final Rule found that the "primary constituent elements" ("PCEs") for the sucker are "a functioning hydrological system that experiences peaks and ebbs in the water volume and maintains a sand, gravel, and cobble substrate in a mosaic of sandy stream margins, deep water pools, riffles [and] runs; sufficient water volume and quality; and complex, native floral and faunal associations."  69 Fed. Reg. 8,839, 8,843 (Feb. 26, 2004).  Although the FWS found that Units 1A and 1B "are not known to be occupied, they are essential for the conservation of the Santa Ana sucker because they provide and transport sediment necessary to maintain the preferred substrates utilized by this fish . . . , convey stream flows and flood waters necessary to maintain habitat conditions for the Santa Ana sucker; and support riparian habitats that protect water quality in the downstream portions of the Santa Ana River occupied by the sucker."  *Id.* at 8,844–45 (citations omitted).

Notwithstanding these findings, the FWS exercised its authority under Section 4(b)(2) of the ESA to exclude "essential habitat" that included areas encompassed by the MSHCP and the SASCP.  The FWS concluded that "the benefits of excluding essential habitat within the boundaries of" these agreements, such as fostering continuing cooperative spirit with local agencies, educational value, and likely changes in conservation, "outweigh the benefits of including these areas as critical habitat," and that this exclusion "will not result in the extinction of the sucker."  *Id.* at 8,846–48.

### 3.  2005 Final Rule and Subsequent Litigation

Because the 2004 Final Rule had been promulgated without an opportunity for public review and comment in order to comply with the district court's order, the FWS accepted review and comment on the simultaneously released 2004 Proposed Rule, which was ultimately promulgated as a new 2005 Final Rule.  The 2005 Final Rule revised the PCEs for the sucker and reduced the designated critical habitat to 8,305 acres.  Specifically, all portions of the habitat in the Santa Ana River and its tributaries (Unit 1) were removed from designation because they were no longer considered "essential."  However, this change rendered the 2005 Final Rule internally inconsistent, because the rationale for designating certain unoccupied portions of other river systems as essential was the same as the rationale used to reject designation for the units along the Santa Ana River. For example, while unoccupied areas in Unit 3 (the Big Tujunga Creek) were designated as essential because they transported sediment downstream to occupied areas, unoccupied areas in Unit 1A were now deemed "not essential," even though they also transported sediment to downstream occupied areas. Additionally, while certain sections of the 2005 Final Rule state that Units 1A and 1B are not essential, the FWS did not remove other language in the Final Rule that refers to habitat within these units as essential. *See, e.g.*, 70 Fed. Reg. 426, 443 (Jan. 4, 2005) ("[W]e analyzed the impacts of the MSHCP . . . on the Santa Ana sucker and its essential habitat within the plan boundaries.").

Various conservation groups pressed the FWS on these inconsistencies, raising questions about the integrity of the scientific information used and whether the decision was consistent with appropriate legal standards. In response, the

FWS announced in July 2007 that it would review the 2005 Final Rule. In November 2007, the conservation groups again sued the FWS, alleging that the 2005 Final Rule violated the ESA and the Administrative Procedure Act ("APA"), and that the rule making resulted from improper political influence not grounded in reliable science. The parties settled in 2009. The settlement agreement approved by the district court required the FWS to "reconsider its critical habitat designation for the Santa Ana sucker," and to submit a proposed rule by December 2009, with a final rule due by December 2010. *Cal. Trout v. U.S. Fish and Wildlife Serv.*, No. 08-cv-4811, Dkt. No. 41 (C.D. Cal. Jan. 21, 2009).

### 4. 2009 Proposed Rules and 2010 Final Rules

The FWS released a new proposed rule in December 2009, with a slight revision in July 2010, designating 9,605 acres of habitat from the three river systems, including 1,900 acres of unoccupied habitat from the Santa Ana River that was previously found not essential in the 2005 Rule (identified as new subunit 1A). 74 Fed. Reg. 65,056 (proposed Dec. 9, 2009), *revised by* 75 Fed. Reg. 38,441 (proposed July 2, 2010). The FWS noted that it was considering exercising its discretion to exclude 5,472 acres of designated habitat, consisting of areas within the SASCP and MSHCP (identified as new subunits 1B and 1C).

In connection with the Proposed Rule, the FWS held two open 60-day comment periods, hosted two public hearings in July 2010, and contacted "appropriate Federal, State, and local agencies; scientific organizations; and other interested parties and invited them to comment on the proposed rule and D[raft] E[conomic] A[nalysis] during these comment periods." 75 Fed. Reg. 77,961, 77,989 (Dec. 14, 2010). The

FWS also subjected its rule to peer review, responded to several Congressional inquiries, and met with various stakeholders, including Appellants' representatives. *See id.* at 77,989–94. Various agencies participating in the SASCP and MSHCP, including Appellants, commented extensively on the 2009 Proposed Rule, supporting an exclusion and asking the FWS to adhere to its commitment in the MSHCP-IA to exclude MSHCP land.

In December 2010, the FWS issued its Final Rule. The 2010 Final Rule designated 9,331 acres of critical habitat across the three river systems. The 2010 Final Rule designated habitat closely along the lines of the 2009 Proposed Rules, except that it removed approximately 400 acres from subunit 1A. The 2010 Final Rule designated approximately 1,500 acres of unoccupied habitat in subunit 1A on the ground that these areas are "essential to the conservation of the species" because they function as pathways to transport storm and stream waters and sediments "necessary to maintain" preferred substrates to occupied portions of the Santa Ana River further downstream. 75 Fed. Reg. at 77,972, 77,978. The FWS also decided not to exclude the areas in subunits 1B and 1C, which included 3,048 acres of land covered by the MSHCP. The FWS found that the benefits of continued exclusion did not outweigh the benefits of inclusion, and declined to exercise its discretion to exclude those areas because of the sucker's conservation status.

## II. Procedural History

In August 2011, the plaintiff municipalities and water districts sued the FWS, challenging the 2010 Final Rule on multiple grounds, and requested declaratory and injunctive relief. As relevant to this appeal, the plaintiffs alleged that the

FWS (1) failed to cooperate with them to resolve water resource concerns pursuant to Section 2(c)(2) of the ESA (claim 1); (2) designated lands along the Santa Ana River or within the MSHCP in a manner that was arbitrary and capricious, in violation of the ESA and the APA (claims 2 and 4); and (3) violated NEPA by failing to prepare an Environmental Impact Statement (claim 6).[1]

In November 2011, California Trout, Inc., the Center for Biological Diversity, the San Bernardino Audubon Society, and the Sierra Club successfully moved to intervene as defendants. The parties cross-moved for summary judgment and in October 2012, the district court granted defendants summary judgment on all claims. *Bear Valley Mut. Water Co. v. Salazar*, No. 11-cv-1263, 2012 WL 5353353 (C.D. Cal. Oct. 17, 2012). In sum, the district court concluded that (1) the FWS complied with its statutory obligations to cooperate with state and local authorities and Section 2(c)(2) of the ESA does not impose additional substantive or procedural obligations on federal agencies, *see id*. at *9–11; (2) an agency's decision not to exclude areas from critical habitat is a discretionary action not subject to judicial review, *see id.* at *14, and the FWS's critical habitat designation was not arbitrary or capricious because it was rationally connected to the best available science, *see id*. at *15, 19–34; and (3) any claim under NEPA is barred by *Douglas County*, *see id.* at *37.

---

[1] Because Appellants did not address several other claims raised before the district court in their opening brief, we consider those claims to be abandoned. *See Christian Legal Soc. Ch. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010).

The municipalities and water districts appealed and the Pacific Legal Foundation successfully moved to appear as amicus curiae in support of Appellants.[2] We have jurisdiction pursuant to 28 U.S.C. § 1291.

## STANDARDS OF REVIEW

We review a district court's grant of summary judgment de novo. *Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011). "We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (quotation omitted). "This Court also reviews *de novo* the district court's evaluations of an agency's actions." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014).

---

[2] The Association of California Water Agencies, State Water Contractors, Metropolitan Water District of Southern California, Main San Gabriel Basin Watermaster, County of Los Angeles, and the Western Riverside County Regional Conservation Authority ("RCA") have also moved for leave to file three separate amicus curiae briefs in support of Appellants. The RCA further requests that this Court take judicial notice of several documents. These motions are opposed by the Intervenors-Appellees. All pending motions for leave to file amicus briefs are hereby granted. RCA's request for this Court to take judicial notice is denied because "judicial review of an agency decision is [generally] limited to the administrative record on which the agency based the challenged decision," and RCA has not shown why the additional materials are "necessary to adequately review" the decision here. *See Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

Claims brought against an agency under the ESA are evaluated under the APA.  Pursuant to the APA, an agency decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "Under this standard, we will 'sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made.'" *San Luis & Delta-Mendota*, 776 F.3d at 994 (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005)).  A federal court may not substitute its judgment for that of the agency. *See, e.g.*, *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 7 (2001).

## ANALYSIS

## I.   Section 2(c)(2) Does Not Create an Independent Cause of Action

Section 2 of the ESA is entitled "Congressional findings and declarations of purposes and policy."  16 U.S.C. § 1531. Section 2(c) provides:

> (c) Policy
>
> (1) It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.
>
> (2) It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to

> resolve water resource issues in concert with conservation of endangered species.

16 U.S.C. § 1531(c).  Appellants argue that the FWS violated Section 2(c)(2) because it failed to cooperate with State and local agencies on water resource issues, by, for example, failing to give sufficient weight to the California State Water Board's determination that the issuance of permits for the proposed diversion from the Santa Ana River at Seven Oaks Dam for municipal purposes would have no impact upon public trust resources, including the sucker, and otherwise declining to engage Appellants in negotiating the critical habitat designation.

This argument fails as a matter of law because, as the district court correctly held, Section 2(c)(2) is a non-operative statement of policy that "does not create an enforceable mandate for some additional procedural step." *Bear Valley*, 2012 WL 5353353, at *11.  By its own terms, Section 2(c)(2) is a subsection of the ESA's declaration of purposes and policy. It is well established that such declarations do not create substantive or enforceable rights. *See Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009) ("[W]here the text of a clause itself indicates that it does not have operative effect. . . . , a court has no license to make it do what it was not designed to do." (quotation marks and citation omitted)). Although we believe the text is clear, we note that this reading is further supported by the statute's legislative history.  When Congress amended the ESA to include Section 2(c)(2) in 1982, the Senate Committee report expressly provided that this provision was "not intended to and does not change the substantive or procedural requirements of the Act."  S. Rep. 97-418, at 25–26 (May 26, 1982).  We also

note that no court has ever construed Section 2(c)(2) to set forth a substantive or procedural requirement.

Appellants claim that this reading renders statutory language superfluous and violates established canons of statutory interpretation. They note that Section 2(c)(2) uses the word "shall," which is typically considered to be a mandate. Appellants contend that the Eighth Circuit's decision in *Defenders of Wildlife v. Administrator, EPA*, 882 F.2d 1294 (8th Cir. 1989) supports their position. There, the court concluded that the ESA "imposes substantial and continuing obligations on federal agencies," citing Section 2(c)(1), which expresses the policy "that all Federal departments and agencies . . . shall utilize their authorities in furtherance of the purposes of this Act." 882 F.2d at 1299. According to Appellants, if Section 2(c)(1) imposes a "substantial and continuing obligation," then so must Section 2(c)(2). However, the *substantive* provisions enforced by the Eighth Circuit were Sections 7 and 9 of the ESA, which set forth the procedures reflecting the policy statement in Section 2(c)(1). Nothing in *Defenders of Wildlife* establishes or recognizes a free-standing claim based on Section 2(c)(1).

Contrary to what Appellants contend, the policy goals embodied in Section 2(c)(2) are implemented through the substantive and procedural requirements set forth in Section 4, which direct the FWS to "give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon," 16 U.S.C. § 1533(b)(5)(A)(ii), and to provide a "written justification" for any rule that was issued

without "adopt[ing] regulations consistent with the [State] agency's comments or petition." 16 U.S.C. § 1533(i). In other words, the procedures set forth in Section 4 outline the scope of "cooperation" required between the FWS and state and local agencies in designating critical habitat. This process is an enhanced level of notice and comment compared to that afforded to the general public through notice in the Federal Register and publication in a newspaper that circulates in the area in which the species is believed to occur. It is undisputed that the FWS complied with Section 4 of the ESA.

Appellants argue that Section 2(c)(2)'s mandate of "cooperation" is not satisfied by Section 4's procedures, and that the provision creates additional obligations where "water resource issues" are involved. As support for this contention, Appellants cite to *California Wilderness Coalition v. U.S. Department of Energy*, which held that a provision of the Energy Policy Act that required "consultation with affected States" in conducting a study concerning certain transmission corridors issues mandated that the DOE "confer with the affected States before . . . complet[ing]" the study, rather than rely on the statute's notice and comment procedure. 631 F. 3d 1072, 1088 (9th Cir. 2011). But as the district court noted, *both* relevant provisions of the Energy Policy Act at issue in *California Wilderness* are substantive and distinct because "the opportunity to comment provision applie[s] to the issuing of a . . . . report based on the congestion study previously subject to consultation." *Bear Valley Mut. Water Co.*, 2012 WL5353353, at *10. But here, Section 2(c)(2) merely announces a general policy goal that is reflected in the substantive and procedural requirements of Section 4.

Finally, Appellants' citation to legislative history is unavailing. Although Appellants cite some portion of the

legislative history which suggests that Congress intended for "most of the potential conflicts between species conservation and water resource development [to] be avoided through close cooperation," this same text later makes explicitly clear that Section 2(c)(2) does not "change the substantive or procedural requirements of the Act."  Accordingly, we affirm the district court's grant of summary judgment in favor of Appellees as to claim 1.

## II.  The Critical Habitat Designation of Land Covered by the MSHCP Was Proper

### A.  Legal Framework

Section 4(b)(2) requires the FWS to designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2).  "The determination of what constitutes the 'best scientific data available' belongs to the agency's 'special expertise . . . .When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983)).

A critical habitat designation must describe the PCEs, which are the "physical and biological features essential to the conservation of the species and which may require special management considerations or protection."    50 C.F.R. § 424.12(b).  The FWS "may exclude any area from critical

habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless [it] determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." 16 U.S.C. § 1533(b)(2).

## B. Appellants' Challenge to the FWS's Decision Not to Exercise Its Discretion to Exclude Land Covered by the MSHCP Fails

Judicial review of agency decisions under the APA does not apply to an "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An action is committed to agency discretion where there is no "meaningful standard against which to judge the agency's exercise of discretion." *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Typically, where a statute is written in the permissive, an agency's decision not to act is considered presumptively unreviewable because courts lack "a focus for judicial review . . . to determine whether the agency exceeded its statutory powers." *Id*. at 832. Here, the district court found that, to the extent Appellants argued that the FWS violated the ESA and the APA by not exercising its discretion to exclude land covered by the MSCHP, that agency decision is unreviewable because "[t]he statute is written in the permissive," and authorizes the FWS to exclude essential area from a critical habitat designation but does not compel it to do so. *Bear Valley Mut. Water Co.*, 2012 WL 5353353, at *14. For the reasons explained below, we agree with the district court that an agency's decision not to exclude critical habitat is unreviewable.

Appellants' principle argument is that if there is a manageable standard to review an agency's decision *to exclude*, which all parties agree is subject to review, the same standard can, and should be, used to review an agency's decision *not* to exclude.  Their authority for this proposition is the D.C. Circuit's decisions in *Amador County v. Salazar*, 640 F.3d 373, 379–83 (D.C. Cir. 2011), and *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401–02 (D.C. Cir. 1995), cases in which the court held that a statute is not made unreviewable by the use of permissive language alone.  This argument is unavailing.

In *Amador County*, the D.C. Circuit analyzed a provision of the Indian Gaming Regulatory Act, which states that the Secretary of Commerce "may disapprove a [Tribal-State] compact [entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe] . . . only if such compact violates (i) any provision of this chapter, (ii) any other provision of Federal law . . . , or (iii) the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B).  The court found that subsection (d)(8)(B)'s "use of 'may' is best read to limit the circumstances in which disapproval is allowed."  *Amador Cnty.*, 640 F.3d at 381.  In *Dickson*, the D.C. Circuit analyzed a statute directing that the Army Board for Correction of Military Records "may excuse a failure to file [a request for a correction of military records] within three years after discovery if it finds it to be in the interest of justice."  68 F.3d at 1399 (quoting 10 U.S.C. § 1552(b)).  The court concluded that Congress did not intend "may" to confer complete discretion because "this construction would mean that even if the Board expressly found in a particular case that it was in 'the interest of justice' to grant a waiver, it could still decline to do so."  *Id.* at 1402, n.7.

Appellants, however, misunderstand the standard under which a decision to exclude is reviewable.  Unlike *Amador County* and *Dickson*, where the government argued that it was not obligated to take any action, the FWS *is* obligated to take an action under Section 4(b)(2), *i.e.*, designate essential habitat as critical.  The decision to exclude otherwise essential habitat is thus properly reviewable because it is equivalent to a decision not to designate critical habitat.

But the statute cannot be read to say that the FWS is ever obligated to exclude habitat that it has found to be essential. Such a decision is always discretionary  and the statute "provides absolutely no standards that constrain the Service's discretion" not to exclude, unlike the statute reviewed in *Amador County*, which cabined the agency's discretion to disapprove compacts to a set of specified conditions.  *See Conservancy of Sw. Fla. v. U.S. Fish and Wildlife Serv.*, 677 F.3d 1073, 1084, n. 16 (11th Cir. 2012) (distinguishing *Amador County* and finding that the use of the word "may" in another section of the ESA precludes the review of an agency's exercise of discretion); *see also Ekimian v. INS*, 303 F.3d 1153, 1159 (9th Cir. 2002) (holding that where the Board of Immigration is permitted to reopen proceedings in "exceptional circumstances," its decision *not* to reopen a case is unreviewable because there are no "statutory, regulatory, or caselaw definition[s] of 'exceptional circumstances'" and thus no manageable standard to apply on review).**[3]**

---

**[3]** We note that our holding today also comports with every lower court that has addressed this issue to date.  *See Aina Nui Corp. v. Jewell*, 52 F. Supp. 3d 1110, 1132 n.4 (D. Haw. 2014) ("The Court does not review the Service's ultimate decision not to exclude . . . , which is committed to the agency's discretion."); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't. of the Interior*, 731 F. Supp. 2d 15, 29 (D.D.C. 2010) ("The plain reading of the statute fails to provide a standard by which to judge the Service's

Accordingly, we affirm the district court's holding that the FWS's decision not to exclude land covered by the MSHCP is not subject to review.

## C. The FWS's Designation of Lands Included in the MSHCP Was Not Arbitrary or Capricious

Even if an agency's decision *not* to exclude is unreviewable, courts undisputedly have the authority to review whether the FWS properly *included* an area in a critical habitat designation.  This inquiry turns on whether the designation was based on "the best scientific data available," and whether the FWS took into consideration the economic, national security, or any other relevant impacts, of "specifying any particular area as critical habitat," 16 U.S.C. § 1533(b)(2).

Appellants do not argue that the FWS relied on faulty scientific data, or that there is no rational relationship between the facts underlying the determination that the MSHCP lands were essential and the FWS's designation of critical habitat.   Rather, Appellants contend that "[b]y executing the MSHCP and its Implementation Agreement, the FWS assured [p]ermittees that it would not designate MSHCP land unless it first found that the plan was not being implemented." According to Appellants, the inclusion of this land in the 2010 Final Rule was a "radical departure from

decision not to exclude an area from critical habitat."); *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, No. 05-cv-629, 2006 WL 3190518 (E.D. Cal. Nov. 2, 2006) ("[T]he court has no substantive standards by which to review the [agency's] decisions not to exclude certain tracts based on economic or other considerations, and those decisions are therefore committed to agency discretion.").

prior precedent and in contravention of assurances provided in the IA," and the FWS's failure to consider the consequences of violating those assurances makes the 2010 Final Rule arbitrary and capricious.  We disagree.

The MSHCP-IA states that the FWS will not designate land within the agreement "to the maximum extent allowable after public review and comment."  While Appellants read this provision to require that the FWS exercises its discretion under Section 4(b)(2) to exclude MSHCP land unless absolutely barred from doing so under the law, the Federal Appellees respond that the MSHCP-IA does not constitute a "contractual assurance[] that the agency would not designate as critical habitat lands covered by the MSHCP" because "[t]he FWS did not, nor could it, promise to ignore its ESA obligations."  Further, the Federal Appellees argue that it would be inappropriate and unlawful for an agency to "commit to the substantive outcome of a future rulemaking in an agreement with a specific group like the MSHCP signatories."

To the extent Appellants believe the MSHCP-IA creates an enforceable guarantee not to designate critical habitat, they are mistaken.  Although Appellants raise valid concerns about the permittees' reliance on the  FWS's promise not to designate lands "to the maximum extent allowable," the FWS may not relinquish its statutory obligation to designate essential critical habitat by contract with third parties. Nevertheless, Appellants correctly argue that the MSHCP is a "relevant impact" that should have been considered in the process of rulemaking.  Contrary to Appellants' assertions, the FWS fully considered the MSHCP as a "relevant impact," and its conclusion that designation of critical habitat was nevertheless warranted is, consequently, permissible.

At the time the 2010 Final Rule was promulgated, the FWS's duty to consider "any other relevant impact" under Section 4(b)(2) required that the Service "identify any significant activities that would either affect an area considered for designation as critical habitat or be likely to be affected by the designation," and "consider the probable economic and other impacts of the designation upon proposed or ongoing activities." 50 C.F.R. § 424.19 (2010), *revised by* 78 Fed. Reg. 53,058 (Aug. 28, 2013).

The FWS fully considered the impact of including the areas covered by the MSHCP (as well as the SASCP) in the 2010 Final Rule, including the potentially deleterious impact on future local cooperation efforts. *See* 75 Fed. Reg. at 77,985–87 ("Rationale for Including the Western Riverside County MSHCP and SAS Conservation Program in This Final Critical Habitat Designation"). Nevertheless, the FWS found that the designation of critical habitat was warranted. Specifically, the FWS noted that "the status of the Santa Ana sucker and the status of its habitat continue to decline throughout the Santa Ana River system," and that because mitigation under the MSHCP is to be implemented over a 75 year period, the continued decline warranted inclusion of essential habitat within the MSHCP area.[4] *Id.* at 77,985. The FWS also noted that designation will provide a significant

---

[4] Appellants argue that this conclusion is not supported by the factual record because a large percentage of sucker habitat had already been conserved under the terms of the MSHCP. However, as the RCA admits, "the acquisition of additional conservation land was intended to be a multi-step, gradual process where land is acquired in rough proportionality to development" over the first 25 years of the plan. Thus, the FWS's conclusion that the MSHCP would likely benefit the sucker in the long term, but would not necessarily resolve short-term conservation problems, is not arbitrary and capricious.

public educational benefit, and may strengthen other laws in a manner beneficial to the sucker.  *Id.* at 77,986.

Appellants contend that the FWS's decision was arbitrary and capricious because the 2010 Final Rule (1) failed to cite or address the specific assurance not to designate critical habitat in the MSHCP-IA, or (2) to explain the decision to reverse the exclusion in the 2004 and 2005 Final Rules.  But as Appellants admit, the FWS specifically determined that "'the partnership benefits of exclu[sion] . . . do not outweigh the regulatory and educational benefits afforded . . . as a consequence of designating critical habitat in this area.'"  Thus, the 2010 Final Rule fully addresses the impact on conservation plans and local partnerships.  Further, the Final Rule explains the changed circumstances requiring designation and articulates the reasons for why the benefits of inclusion outweigh the benefits of exclusion.  This is clearly adequate even in the absence of a specific citation to the assurance in the MSHCP-IA.

### D. The Designation Does Not Violate the "No Surprises Rule"

Alternatively, Appellants argue that the designation of habitat in areas covered by the MSHCP violates the FWS's "No Surprises Rule."  The "No Surprises Rule" provides that once a permit has been issued pursuant to a habitat conservation plan, and assuming that the terms of the underlying plan are being implemented, the permittee "may remain secure regarding the agreed upon cost of conservation and mitigation."  Habitat Conservation Plan Assurances ("No Surprises") Rule, 63 Fed. Reg. 8,859, 8,867 (Feb. 23, 1998).  In other words, the FWS may not require permittees to pay

for additional conservation and mitigation measures absent "unforeseen circumstances." 50 C.F.R. §§ 17.32(b)(5)(ii–iii).

We agree with the district court that, although the FWS cites the possibility of "conservation not currently provided under the plan" as a potential benefit in the critical habitat designation, nothing in the 2010 Final Rule discusses "additional measures by the [MSHCP] permittees in undertaking covered activities," nor does the 2010 Final Rule require the permittees to undertake any additional acts for conservation. *Bear Valley Mut. Water Co.*, 2012 WL 5353353, at *15. Appellants admit that the FWS has not yet imposed such a requirement, but contend that the "additional regulatory benefit" rationale is arbitrary and capricious because it *could* violate the No Surprises Rule in the future. At this juncture, these concerns are speculative. Tellingly, the Appellants can point to no additional conservation or mitigation measures that have been imposed on them. Consequently, based on the record on this appeal, we conclude that  the 2010 Final Rule does not violate the No Surprises Rule.

### E. Appellants Had Adequate Opportunity to Comment on the FWS's Scientific Citations

Next, the Appellants argue that the FWS committed error by citing to two new studies—SMEA 2009 and Thompson et. al., 2010—in the 2010 Final Rule to support its conclusion that the status of the sucker and its available habitat have continued to decline. We see no impropriety in the use of those studies.

The ESA's notice and comment procedures require that the public be given an opportunity to provide comments on

the contents of a proposed rule. The contents of a proposed rule for a revised habitat designation "shall contain the complete text of the proposed rule, a summary of the data on which the proposal is based (including, as appropriate, citation of pertinent information sources), and shall show the relationship of such data to the rule proposed." 50 C.F.R. § 424.16(b) (effective prior to May 31, 2012). While "[a]n agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary . . . . the public is not entitled to review and comment on every piece of information utilized during rule making. . . . [A]n agency, without reopening the comment period, may use supplementary data . . . that expands on and confirms information contained in the proposed rulemaking . . . so long as no prejudice is shown." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (internal quotations omitted); *accord Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir. 1995).

The Federal Appellees correctly contend that the Thompson and SMEA studies simply expand upon and confirm the data used to support two conclusions in the 2009 Proposed Rule—the decline of the sucker and its habitat. Further, the Thompson study was cited in the Proposed Rule in its draft form, and was thus available to the public for comment. While the SMEA study was not available at the time of the Proposed Rule, it was supplementary to the otherwise cited studies, which also found that the sucker and its habitat have declined over time.

Appellants do not challenge the reliability of the studies, but disagree with the FWS's interpretation and use of the studies. Specifically, Appellants argue that the majority of

the studies in the 2009 Proposed Rule predate 2004, while the FWS based its decision to designate critical habitat in the 2010 Final Rule on a conclusion, supported by the new studies, that there has been a *continued* decline of the sucker since the MSHCP was finalized in 2004.

Appellants' contention that the FWS used these studies to show decline since 2004 is not correct. Rather, the FWS used these studies to supplement the previous studies which showed the persistent decline of the sucker and its habitat over time. Appellants fail to explain why the pre-2004 studies would not tend to support the conclusion that the habitat continues to decline. More importantly, Appellants do not explain why the 2009 Proposed Rule's citation to the pre-2004 studies did not put them "on notice" that the decline of the sucker and its habitat were relevant factors in the FWS's decision making process, and did not afford Appellants an opportunity to comment on those issues.

Even if the FWS somehow erred in failing to reopen the comment period after the addition of these two studies, Appellants fail to demonstrate how this error prejudiced them. *See* 5 U.S.C. § 706 (requiring that a court reviewing agency decisions take "due account . . . of the rule of prejudicial error")." Appellants do not challenge the studies' reliability or conclusions or cite to studies supporting alternative findings. Accordingly, we affirm the district court's grant of summary judgment in favor of Appellees on all claims arising out of the designation of critical habitat in areas covered by the MSHCP.

### III.    The FWS's Designation of Critical Habitat in Unoccupied Areas Was Proper

The ESA authorizes the FWS to designate unoccupied areas "upon a determination by the [Service] that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). The implementing regulation further provides that "critical habitat areas outside the geographical area presently occupied by a species" should be designated "only when a designation limited to its present range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e).

The 2010 Final Rule designated unoccupied habitat in subunit 1A of the Santa Ana River as essential because areas within subunit 1A are the primary sources of high quality coarse sediment for the downstream occupied portions of the Santa Ana River. The Final Rule determined that coarse sediment was essential to the sucker because provided a spawning ground as well as a feeding ground from which the sucker obtained algae, insects, and detritus. The Final Rule also determined that Subunit 1A assisted in maintaining water quality and temperature in the occupied reaches of the river. 75 Fed. Reg. at 77,972–73, 77,977–78.

Appellants claim that this justification fails to establish that subunit 1A is essential to the conservation of the species *and* that the designated occupied areas are inadequate to ensure the conservation of the species. Although Appellants consider these to be two separate requirements, they are identical. The ESA requires the FWS to demonstrate that unoccupied area is "essential" for conservation before designating it as critical habitat. The implementing regulation phrases this same requirement in a different way,

and states that the FWS must show that the occupied habitat is not adequate for conservation. As the district court properly found, "[i]f certain habitat is essential, it stands to reason that if the [Service] did not designate this habitat, whatever the [Service] otherwise designated would be inadequate. . . . [T]he regulation provides only elaboration and not an additional requirement or restriction." *Bear Valley Mut. Water Co.*, 2012 WL 5353353, at *22. The Final Rule sufficiently explained why the designation of unoccupied habitat in subunit 1A was essential, and conversely, why designation of solely occupied habitat was inadequate for the conservation of the species.

Appellants further contend that the FWS's justification for designating this unoccupied land was arbitrary and capricious because "uninhabitable source areas do not meet the statutory requirement for critical habitat." There is no support for this contention in the text of the ESA or the implementing regulation, which requires the Service to show that the area is "essential," without further defining that term as "habitable." Finally, Appellants argue that the FWS's reliance on the fact that PCEs exist in the designated unoccupied habitat is contrary to the statute because it is the same test used for occupied habitat. But the 2010 Final Rule does not designate subunit 1A as essential only because it contains PCEs. Rather, the area is designated as essential because it provides "sources of water and coarse sediment . . . . *necessary* to maintain preferred substrate conditions" for the sucker. 75 Fed. Reg. at 77,972–73 (emphasis added). For these reasons, we affirm the district court's grant of summary judgment in favor of Appellees as to all claims pertaining to the designation of unoccupied habitat in subunit 1A.

## IV.      Appellants' NEPA Claim Fails as a Matter of Law

Finally, Appellants contend that the FWS violated NEPA by failing to prepare an environmental impact statement in connection with its 2010 Final Rule.  Any such claim is foreclosed by the controlling law of this Circuit, which holds "that [the] NEPA does not apply to the designation of a critical habitat."  *Douglas Cnty.*, 48 F.3d at 1502.  Although Appellants ask this Court to revisit and overrule *Douglas County*, "in the absence of intervening Supreme Court precedent, one panel cannot overturn another panel."  *Hart v. Massanari*, 266 F.3 115, 1171–72 (9th Cir. 2001).  Accordingly, we affirm the district court's grant of summary judgment in favor of Appellees on any claim arising under NEPA.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.