**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TROUT UNLIMITED, *Plaintiff-Appellant*, | No. 20-35504 |
| and | D.C. Nos. 3:19-cv-00265-SLG 3:19-cv-00267-SLG 3:19-cv-00268-SLG |
| BRISTOL BAY ECONOMIC DEVELOPMENT CORPORATION; BRISTOL BAY NATIVE ASSOCIATION, INC.; UNITED TRIBES OF BRISTOL BAY; BRISTOL BAY REGIONAL SEAFOOD DEVELOPMENT ASSOCIATION, INC.; BRISTOL BAY RESERVE ASSOCIATION; SALMONSTATE; ALASKA CENTER; ALASKA COMMUNITY ACTION ON TOXICS; ALASKA WILDERNESS LEAGUE; COOK INLETKEEPER; DEFENDERS OF WILDLIFE; EARTHWORKS; FRIENDS OF MCNEIL RIVER; NATIONAL PARKS CONSERVATION ASSOCIATION; NATIONAL WILDLIFE FEDERATION; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB; WILD SALMON CENTER; MCNEIL RIVER ALLIANCE, *Plaintiffs*, | OPINION |

v.

MICHELLE PIRZADEH, in her
official capacity as Acting
Regional Administrator of the
U.S. Environmental Protection
Agency, Region 10; MELISSA
HOFFER, in her official capacity
as Acting General Counsel for
EPA and delegated authority of
the Administrator; U.S.
ENVIRONMENTAL PROTECTION
AGENCY; MICHAEL S. REGAN, in
his official capacity as
Administrator,[*]
                *Defendants-Appellees*,

STATE OF ALASKA,
  *Intervenor-Defendant-Appellee.*

Appeal from the United States District Court
for the District of Alaska
Sharon L. Gleason, District Judge, Presiding

Argued and Submitted August 12, 2020
San Francisco, California

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Michelle Pirzadeh is substituted for her predecessor as Acting Regional
Administrator of the U.S. Environmental Protection Agency, Region 10;
Melissa Hoffer is substituted for her predecessor as Acting General
Counsel for EPA; and Michael S. Regan is substituted for his
predecessor as Administrator.

Filed June 17, 2021

Before:  Susan P. Graber and Daniel A. Bress, Circuit Judges, and Robert T. Dawson,[**] District Judge.

Opinion by Judge Graber;
Dissent by Judge Bress

---

**SUMMARY**[***]

---

**Environmental Law / Administrative Procedure Act**

The panel affirmed in part, and reversed in part, the district court's dismissal of an action challenging the U.S. Environmental Protection Agency ("EPA")'s 2019 withdrawal of its 2014 proposed determination to exercise its authority under Section 404(c) of the Clean Water Act to restrict the ability of miners to operate in part of the Bristol Bay watershed in southwestern Alaska.

The district court held the EPA's decision was unreviewable pursuant to 5 U.S.C. § 701(a)(2) of the Administrative Procedure Act's exception to reviewability, and *Heckler v. Chaney*, 470 U.S. 821 (1985), because neither the Clean Water Act nor the EPA's regulations included a meaningful legal standard governing the EPA's decision.

---

[**] The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Reviewing de novo, the panel held that the Clean Water Act contained no meaningful legal standard in its broad grant of discretion to the EPA, but the EPA's regulations contained a meaningful legal standard. Specifically, to the extent that plaintiff's complaint challenged the EPA Administrator's failure to take action pursuant to the Clean Water Act, without reference to the agency's implementing regulations, the panel held that it lacked jurisdiction. Accordingly, the panel affirmed the district court's dismissal of plaintiff's complaint insofar as the complaint rested directly on the Clean Water Act. The panel held, however, that 40 C.F.R. § 231.5(a) allowed the EPA to withdraw a proposed determination only when an "unacceptable adverse effect" on specified resources was not "likely." Accordingly, the decision was subject to judicial review under the Administrative Procedure Act. The panel remanded for further proceedings to determine whether the EPA's withdrawal was arbitrary, capricious, an abuse of discretion, or contrary to law pursuant to 5 U.S.C. § 706(2)(A).

The panel rejected the EPA's argument that the withdrawal of the proposed determination here was best characterized as an agency's decision not to take enforcement action that was presumptively unreviewable.

Dissenting, Judge Bress would hold that the agency's withdrawal from its discretionary exploratory process was not subject to judicial review. Judge Bress wrote that the majority opinion turned on a misreading of the governing regulations, rewrote the rules that the EPA set for itself, and inserted courts into what was supposed to be the preliminary stages of a discretionary agency review process.

**COUNSEL**

Paul A. Werner III (argued), Steven P. Hollman, Abraham J. Shanedling, and Kirsten O. Ryan, Sheppard Mullin Richter & Hampton LLP, Washington, D.C., for Plaintiffs-Appellant.

Anna T. Katselas (argued), Michael T. Gray, and Mark A. Nitczynski, Attorneys; Eric Grant, Deputy Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Carrie Wehling and Heidi Nalven, Attorneys, United States Environmental Protection Agency, Washington, D.C.; for Defendants-Appellees.

**OPINION**

GRABER, Circuit Judge:

The Bristol Bay watershed in southwestern Alaska contains considerable ecological and commercial resources. One of the greatest wild salmon fisheries in the world, Bristol Bay supports a diverse ecosystem, commercial fishing operations, recreational fishing, and a subsistence way of life for many tribal communities. The watershed also holds rich mineral stores, attracting the attention of mining companies. Competing interests have generated significant controversy over the best uses of the watershed, but this appeal stands apart from that debate; we decide only a single legal issue concerning the reviewability of an agency's decision under the Administrative Procedure Act ("APA").

In 2014, the Environmental Protection Agency ("EPA") formally proposed to exercise its authority under § 404(c) of

the Clean Water Act to restrict the ability of miners to operate in part of the watershed.  Five years later, after conducting nine public hearings and after receiving nearly two million public comments, the EPA withdrew its proposed determination by publishing an explanation in the Federal Register as its final agency action.  Plaintiff Trout Unlimited then filed this action against Defendants EPA and several EPA officials in their official capacities, challenging the withdrawal of the EPA's proposed determination as a violation of both the Clean Water Act and the implementing regulations.

Courts ordinarily may review final agency actions, but Defendants moved to dismiss on the ground that the EPA's withdrawal fell within an exception to reviewability for agency actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2).   The district court agreed with Defendants, holding that the EPA's decision was unreviewable pursuant to 5 U.S.C. § 701(a)(2) and *Heckler v. Chaney*, 470 U.S. 821 (1985).  In the district court's view, neither the Clean Water Act nor the EPA's regulations include a meaningful legal standard governing the EPA's decision.

Reviewing de novo, *City and County of San Francisco v. U.S. Dept. of Transp.*, 796 F.3d 993, 998 (9th Cir. 2015), we hold that (a) the Clean Water Act contains no meaningful legal standard in its broad grant of discretion to the EPA but that (b) the EPA's regulations do contain a meaningful legal standard.  In particular, 40 C.F.R. § 231.5(a) allows the EPA to withdraw a proposed determination only when an "unacceptable adverse effect" on specified resources is not "likely."  Accordingly, we affirm in part and reverse in part the dismissal.   We remand for further proceedings to determine whether the EPA's withdrawal was arbitrary,

capricious, an abuse of discretion, or contrary to law, 5 U.S.C. § 706(2)(A). We express no view on that question.

## BACKGROUND

### A. *Section 404(c) of the Clean Water Act*

The Clean Water Act generally prohibits the discharge of dredged and fill materials into the waters of the United States without a permit. 33 U.S.C. §§ 1311(a), 1344(a). Section 404 of the Act governs "[p]ermits for dredged or fill material" and assigns varying responsibilities to two agencies: the U.S. Army Corps of Engineers and the EPA. *Id.* § 1344. Generally speaking, the Corps administers the § 404 permitting program,[1] and the EPA uses its environmental expertise to shape the contours of the program. *See, e.g.*, 44 Fed. Reg. 58076, 58081 (Oct. 9, 1979) ("While Congress had faith in the Corps' administrative experience, it recognized EPA as the 'environmental conscience' of the Clean Water Act.").

Section 404(a) provides that the Corps "may issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a). Section 404(b), titled "[s]pecification for disposal sites," requires the Corps to "specif[y]" "each such disposal site . . . for each such permit." *Id.* § 1344(b). But the Corps' § 404(b) authority to specify disposal sites is expressly "[s]ubject to subsection (c) of this section." *Id.* In turn, § 404(c) provides in full:

---

[1] A State may also create its own permitting program under the Act, which shifts many of the Act's responsibilities to the State. 33 U.S.C. § 1344(g). Like most States, Alaska has chosen not to create its own program, so our analysis focuses on the roles of the two federal agencies.

> The Administrator [of the EPA] is authorized
> to prohibit the specification (including the
> withdrawal of specification) of any defined
> area as a disposal site, and he is authorized to
> deny or restrict the use of any defined area for
> specification (including the withdrawal of
> specification) as a disposal site, whenever he
> determines, after notice and opportunity for
> public hearings, that the discharge of such
> materials into such area will have an
> unacceptable adverse effect on municipal
> water supplies, shellfish beds and fishery
> areas (including spawning and breeding
> areas), wildlife, or recreational areas. Before
> making such determination, the
> Administrator shall consult with the
> Secretary [of the Army]. The Administrator
> shall set forth in writing and make public his
> findings and his reasons for making any
> determination under this subsection.

*Id.* § 1344(c).

Section 404(c) thus "authorize[s]" the Administrator of
the EPA to take action "whenever he determines" that the
discharge of dredged or fill material "will have an
unacceptable adverse effect" on environmental resources.
*Id.*; *see* 40 C.F.R. § 231.2(e) (defining "unacceptable
adverse effect" to encompass "significant degradation of
municipal water supplies . . . or significant loss of or damage
to" other resources). The Administrator may declare an area
off-limits entirely for a § 404 permit ("prohibit the
specification"); or, less drastically, he may "restrict the use"
of an area, thus limiting the scope of any allowable § 404
permit. *Id.*; 40 C.F.R. § 231.2(b)–(c); *see* 44 Fed. Reg. at

58076 (stating that the EPA could restrict the use of an area by, for example, prohibiting a particular dredged or fill material). The EPA has interpreted the statutory text to allow it to act at any time: before a permit application has been filed, while a permit application is pending, or even after the Corps has issued a permit. 44 Fed. Reg. at 58076; 40 C.F.R. § 231.2(a)–(c); *see also Mingo Logan Coal Co. v. U.S. EPA*, 714 F.3d 608, 612–16 & n.3 (D.C. Cir. 2013) (holding that the statute's use of the phrases "whenever" and "including the withdrawal of specification" evince Congress' intent to allow the EPA to use its § 404(c) authority after a permit issues). The EPA and others have referred to the § 404(c) authority as a "veto." *E.g.*, 44 Fed. Reg. at 58076, 58081; *Mingo Logan*, 714 F.3d at 613.

The statute requires "notice and opportunity for public hearings," and it requires the Administrator to issue a public, written explanation for any § 404(c) determination. 33 U.S.C. § 1344(c). But the statute is silent on the mechanics and details of those requirements.

B. *Implementing Regulations*

In 1979, the EPA promulgated extensive regulations that govern the exercise of its § 404(c) authority. 40 C.F.R. §§ 231.1–231.8. Because the regulations are important to this appeal, we describe them in some detail.

The § 404(c) process starts with a "proposed determination" by a Regional Administrator. *Id.* § 231.1(b)(1). "If the Regional Administrator has reason to believe . . . that an 'unacceptable adverse effect' could result from the specification or use for specification of a defined area for the disposal of dredged or fill material, he may initiate the following actions . . . ." *Id.* § 231.3(a). The Regional Administrator first may notify the Corps' District

Engineer, the owner of the site, and any permit applicant of the Regional Administrator's intent to issue public notice of "a proposed determination to prohibit or withdraw the specification, or to deny, restrict or withdraw the use for specification . . . of any defined area as a disposal site." *Id.* § 231.3(a)(1). If the recipients persuade the Regional Administrator that no adverse effect will result, then the process ends. *Id.* § 231.3(a)(1)–(2). But if the recipients do not "demonstrate[] to the satisfaction of the Regional Administrator that no unacceptable adverse effect(s) will occur . . . , the Regional Administrator shall publish notice of a proposed determination in accordance with the procedures of this section." *Id.* § 231.3(a)(2).

"Every public notice shall contain, at a minimum," seven enumerated items describing the proposed determination and other information pertaining to the site. *Id.* § 231.3(b). The Regional Administrator must publish the notice in the Federal Register and in a local newspaper, and the Regional Administrator also must mail the notice to state and federal agencies and to various persons, such as the owner of the site and anyone who has subscribed to receive § 404(c) notices. *Id.* § 231.3(d).

Publication of the notice begins a public comment period, and "any interested persons may submit written comments." *Id.* § 231.4(a). "Comments should be directed to whether the proposed determination should become the final determination and corrective action that could be taken to reduce the adverse impact of the discharge." *Id.* The Regional Administrator must consider the comments. *Id.*

The Regional Administrator "shall hold a public hearing" in certain circumstances: "if an affected landowner or permit applicant or holder requests a hearing," if there is a "significant degree of public interest" in a proposed

determination, or if "it would be otherwise in the public interest to hold a hearing." *Id.* § 231.4(b). If the Regional Administrator holds a public hearing, he or she must issue another public notice, containing all the original information plus the details of the hearing. *Id.* §§ 231.3(c), 231.4(b). "A record of the proceeding shall be made by either tape recording or verbatim transcript." *Id.* § 231.4(c). Anyone may testify or submit written statements, and anyone may be represented by counsel. *Id.* § 231.4(d). "The Regional Administrator or his designee shall afford the participants an opportunity for rebuttal." *Id.* § 231.4(d). Persons may submit written comments after the hearing to be included as part of the hearing file. *Id.* § 231.4(f).

Publication of the notice of a proposed determination also triggers a requirement that the EPA maintain an administrative record. *Id.* § 231.4(g). The administrative record "shall consist of" a range of documents, including all public comments, the hearing file, the hearing transcript, any record pertaining to the site maintained by the Corps, and "[a]ny other information considered by the Regional Administrator or his designee." *Id.* § 231.5(e).

The Regional Administrator's issuance of a proposed determination also has an immediate effect on the Corps. Once the Regional Administrator notifies the Corps of the proposed determination, the Corps may not issue a permit until the EPA concludes its § 404(c) process. 33 C.F.R. § 323.6(b); 40 C.F.R. § 231.3(a)(2). But "the Corps will continue to complete the administrative processing of [any permit] application while the section 404(c) procedures are underway." 33 C.F.R. § 323.6(b).

Soon after the public-comment period ends,

> [t]he Regional Administrator or his designee shall . . . either withdraw the proposed determination or prepare a recommended determination to prohibit or withdraw specification, or to deny, restrict, or withdraw the use for specification, of the disposal site because the discharge of dredged or fill material at such site would be likely to have an unacceptable adverse effect.

40 C.F.R. § 231.5(a).

If the Regional Administrator issues a recommended determination, then he or she forwards the administrative record for the Administrator's review. *Id.* § 231.5(b). The Administrator then makes "a final determination affirming, modifying, or rescinding the recommended determination," after allowing the interested parties a final opportunity to comment. *Id.* § 231.6. A final determination must be published in the Federal Register (and elsewhere), and it "constitutes final agency action." *Id.* § 231.6.

If the Regional Administrator decides, instead, as happened here, to withdraw the proposed determination, then he or she notifies the Administrator. *Id.* § 231.5(c). The Regional Administrator also must notify everyone who previously commented, and those persons "may submit timely written recommendations concerning review." *Id.* § 231.5(c). The Administrator may decide to review the withdrawal, which results in the same review process by the Administrator described above. *Id.* § 231.5(c)(2). Alternatively, the Administrator may accept the withdrawal by declining to notify the Regional Administrator of an intent to review the withdrawal. *Id.* § 231.5(c). "If the

Administrator does not notify him, the Regional Administrator shall give notice [of] the withdrawal of the proposed determination" by publishing the withdrawal in the Federal Register (and elsewhere). *Id.* § 231.5(c)(1). "Such notice shall constitute final agency action." *Id.* § 231.5(c)(1).

The regulations generally prescribe short timeframes, ranging from fifteen to sixty days, for each of the many stages of the process. *E.g.*, *id.* §§ 231.3(a)(2), 231.4(a), 231.5(a), 231.6. But the EPA recognized that the process may take longer: The Administrator or the Regional Administrator may extend the deadlines "upon a showing of good cause." *Id.* § 231.8. "Notice of any such extension shall be published in the Federal Register and, as appropriate, through other forms of notice." *Id.*

The EPA has started the § 404(c) process only about a dozen times in the half-century since the Clean Water Act's enactment. 79 Fed. Reg. 42314, 42317 (July 21, 2014) (stating that it had "completed only 13 section 404(c) actions" in the history of the Act). Nearly every time, the EPA has issued a final determination that constrains the use of the defined area in some way. Only twice has the EPA decided to withdraw a proposed determination.

The first time that the EPA withdrew a proposed determination was in 1991. The Regional Administrator had proposed to restrict the site of a pending project to place gravel on tundra wetlands. 56 Fed. Reg. 58247-01, 58247 (Nov. 18, 1991). As a result of the § 404(c) public process, the project manager significantly revised the project, and the Corps accommodated the change by approving a modification of an existing permit. *Id.* The EPA then concluded that the "revised project . . . represents a significant reduction in scope and is environmentally

acceptable to EPA." *Id.* The EPA accordingly withdrew its proposed determination and listed seven detailed reasons. *Id.* For example, the revised project filled in fewer acres of wetlands with gravel and thereby posed less of a threat to species such as the tundra swan, brant, and caribou. *Id.*

The only other time that the EPA has withdrawn a proposed determination concerns Bristol Bay and is the subject of this appeal.

C. *The Bristol Bay Watershed and Potential Mining*

The Bristol Bay watershed encompasses a vast geographical area in the southwestern corner of Alaska and is home to 25 federally recognized tribes. The EPA has described the watershed as "an area of unparalleled ecological value, boasting salmon diversity and productivity unrivaled anywhere in North America," and as "one of the greatest wild salmon fisheries left in the world." 79 Fed. Reg. at 42315–16. "The Bristol Bay watershed's streams, wetlands, and other aquatic resources support world-class, economically important commercial and sport fisheries for salmon and other fishes, as well as a more than 4,000-year-old subsistence-based way of life for Alaska Natives." 79 Fed. Reg. at 42315. "These salmon populations, in turn, maintain the productivity of the entire ecosystem, including numerous other fish and wildlife species." *Id.*

The watershed also contains valuable minerals, including copper, gold, and molybdenum, most densely located in an area known as the Pebble deposit. *Id.* Since the 1980s, mining companies have considered extracting minerals from the watershed. In the first decade of the 2000s, Pebble Limited Partnership, Northern Dynasty Minerals, Ltd., and their subsidiaries (collectively, "PLP") staked claims to minerals and began discussions with the

EPA, the Corps, and other agencies about obtaining the permits needed to mine the Pebble deposit. In early 2011, PLP submitted preliminary mining plans to the Securities and Exchange Commission. The plans described three stages of open-pit mining, with each stage encompassing an ever-greater scope, ultimately extracting up to 12 billion tons of ore.

Meanwhile, in 2010, nine tribal governments requested that the EPA invoke its § 404(c) authority to protect the watershed's valuable natural resources from mining. The EPA then received similar requests from additional tribes, tribal organizations, commercial and recreational fishers, seafood processors, chefs, restaurant and supermarket owners, fishing and hunting guides, owners of sports fishing and hunting lodges, sporting goods manufacturers and vendors, a coalition of jewelry companies, conservation organizations, members of the faith community, and elected officials. Others requested that the EPA refrain from invoking § 404(c): four tribal governments, other tribal organizations, the governor of Alaska, and lawyers representing PLP.

In early 2011, the EPA began a scientific study of the potential effects of large-scale mining on the watershed and, in January 2014, the effort culminated in the EPA's Watershed Assessment. The Watershed Assessment considered the effects of mining from three different scenarios, chosen from the preliminary plans that the PLP had submitted to the Securities and Exchange Commission. The Watershed Assessment described many risks to natural and human resources posed by each scenario, including the scenario with the smallest mine.

D. *Proposed Determination in 2014 and Withdrawal in 2019*

In 2014, six months after completing the Watershed Assessment, the EPA issued a proposed determination under § 404(c). 79 Fed. Reg. 42314. The Regional Administrator of EPA's Region 10 issued the proposed determination "because of the high ecological and economic value of the Bristol Bay watershed and the assessed unacceptable environmental effects that would result from" mining the Pebble deposit. *Id.* at 42315. The proposed determination did not encompass the entire watershed and did not ban all mining. Instead, the Regional Administrator proposed to prohibit any mines within the geographical area of the Pebble deposit that would result in any of the following conditions: (1) the loss of five miles of streams with documented salmon presence, or nineteen miles of tributaries of those streams; (2) the loss of 1,100 or more acres of wetlands, lakes, and ponds contiguous with salmon streams or tributaries; or (3) streamflow alterations greater than 20% of daily flow in nine miles of salmon streams. *Id.* at 42317. The Regional Administrator calculated those limits from the expected effects of the smallest mine described in the PLP's preliminary mining plans, the same plans that the EPA had assessed in the 2014 Watershed Assessment. *Id.*

The EPA's consideration of the proposed determination over the next five years had many twists and turns. *See* 84 Fed. Reg. 45749-01, 45749–50 (Aug. 30, 2019) (describing the procedural history in some detail). We describe only the points most salient to this appeal.

In 2014 and again in 2017, the EPA solicited public comment. During the initial comment period, stemming from publication of the proposed determination, the EPA

received more than 670,000 written comments, and more than 800 people participated in seven separate hearings held in the watershed and in Anchorage. 82 Fed. Reg. 33123-01, 33123 (Jul. 19, 2017). During the second comment period, stemming from the EPA's 2017 proposal to withdraw the proposed determination, the EPA received more than a million written comments, and about 200 people participated in two additional hearings held in the watershed. 84 Fed. Reg. at 45750.

In December 2017, PLP applied for a § 404 permit from the Corps to mine the Pebble deposit. 84 Fed. Reg. at 45750. According to the EPA, the proposed mine differs in several respects from the assumptions that underlie the 2014 proposed determination. 84 Fed. Reg. at 45753. For example, unlike PLP's preliminary plans in 2011, the PLP now plans to place a liner under a disposal facility, to use less waste rock, and to extract minerals using methods other than cyanide leaching. *Id.*

The permit application caused the Corps to begin preparing an environmental impact statement and, at the Corps' invitation, the EPA became a "cooperating agency" for purposes of developing the environmental impact statement. 84 Fed. Reg. at 45750; *see* 40 C.F.R. § 1501.8 (describing the role of cooperating agencies). The permit application also triggered certain procedural rights that the EPA possesses pursuant to an existing memorandum of agreement between the Corps and the EPA under § 404(q) of the Clean Water Act, 33 U.S.C. § 1344(q). 84 Fed. Reg. at 45752.

In August 2019, the EPA formally withdrew the proposed determination in a detailed, eight-page public notice. 84 Fed. Reg. 45749-01. Pointing to differences between the PLP's permit application in 2017 and the EPA's

assumptions in 2014, the EPA explained that the factual basis for the 2014 proposed determination "has effectively grown stale." 84 Fed. Reg. at 45753. The EPA also expressed confidence in its ability "to work constructively with the Corps" pursuant to the procedures available to the EPA both as a "cooperating agency" and as described in the § 404(q) memorandum of agreement—procedural opportunities that were unavailable to the EPA in 2014. 84 Fed. Reg. at 45754–55. "If EPA believes that these processes are not addressing its concerns, EPA retains the discretion and the authority to . . . initiat[e] a new section 404(c) process that is informed by the entirety of the facts and the Corps' decision-making known to the Agency at that time." 84 Fed. Reg. at 45755.

E. *This Action*

In 2019, a few months after the EPA withdrew its proposed determination, Plaintiff Trout Unlimited brought this action.[2] Plaintiff describes itself as "the nation's largest sportsman's organization dedicated to coldwater conservation," with hundreds of thousands of members nationwide and more than 20,000 members and supporters in Alaska. Plaintiff alleges that the EPA's withdrawal of the proposed determination was arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the Clean

---

[2] Other organizations also filed similar suits, and the district court consolidated the cases. Plaintiff Trout Unlimited is the only appellant before us, so we use the singular "Plaintiff."

The State of Alaska intervened as a Defendant but took no position on the reviewability of the EPA's actions. On appeal, the State expressly declined to file a brief and, instead, notified us that, "[i]n the event this Court reverses, Alaska will renew its briefing on the merits before the District Court on remand."

Water Act, the EPA's regulations, and the APA. Plaintiff alleges, among other things, that political considerations improperly motivated the EPA to abandon, without adequate explanation, its many earlier scientific judgments that mining in the watershed would have unacceptable effects.

The district court granted Defendants' motion to dismiss. The court concluded that the EPA's withdrawal was unreviewable because it was best characterized as a decision not to take an enforcement action and because neither the statute nor the regulations provide a meaningful legal standard for the court to apply. Plaintiff timely appeals.

In July 2020, the Corps issued a final environmental impact statement. 85 Fed. Reg. 44890-01. In November 2020, the Corps denied PLP's permit application. Neither the Corps' denial of a permit nor any other reported action by the relevant agencies has mooted this appeal, because an order setting aside the agency's withdrawal would have effects beyond PLP's specific permit application. *See, e.g.*, "Corps of Engineers allows Pebble appeal for critical permit," *The Cordova Times* (Mar. 6, 2021), available at: https://www.thecordovatimes.com/2021/03/06/corps-of-engineers-allows-pebble-appeal-for-critical-permit/ (reporting that PLP's administrative appeal of the permit denial remains pending before the Corps); "E.P.A. to Review Attacks on Science Under Trump," *The New York Times* (Mar. 24, 2021), available at: https://www.nytimes.com/2021/03/24/climate/trump-science-epa.html (reporting that the EPA plans to review the agency's past decisions, including decisions pertaining to the Pebble mine, for improper political influence).

DISCUSSION

The sole question before us is whether the EPA's withdrawal of its proposed determination is reviewable.

The APA generally authorizes courts to review a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The EPA's publication of the withdrawal in the Federal Register, following notice and comment, marked "the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). Additionally, "legal consequences . . . flow[ed]" from the decision. *Bennett*, 520 U.S. at 178 (internal quotation marks omitted). For example, the withdrawal meant that the Corps no longer was barred from issuing a permit pertaining to the Pebble deposit. 33 C.F.R. § 323.6(b); 40 C.F.R. § 231.3(a)(2). We therefore agree with the parties that the EPA's withdrawal of its proposed determination constituted a "final agency action" for purposes of the APA.[3]

Most—but not all—final agency actions are reviewable. "The Administrative Procedure Act embodies a basic presumption of judicial review and instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A)." *Dep't of Com. v. New York*,

---

[3] The EPA's regulations specify that the publication of a withdrawal of a proposed determination "shall constitute final agency action," 40 C.F.R. § 231.5(c)(1), signaling that the agency considers the process complete. But we, not the agency, are tasked with determining our own jurisdiction under the APA, a statute that the EPA does not administer. Accordingly, we do not accord the agency deference on questions of reviewability under the APA. *Dandino, Inc. v. U.S. Dept. of Transp.*, 729 F.3d 917, 920 n.1 (9th Cir. 2013).

139 S. Ct. 2551, 2567 (2019) (citation and internal quotation marks omitted).  The "strong presumption that Congress intends judicial review of administrative action . . . is overcome only in two narrow circumstances."  *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059,1068 (9th Cir. 2015) (citations and internal quotation marks omitted).  The first exception, which is not at issue here, applies "when Congress expressly bars review by statute."  *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718–19 (9th Cir. 2011) (citing 5 U.S.C. § 701(a)(1)).  The second exception applies when "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Defendants argue that the EPA's withdrawal of the proposed determination falls within that second exception.

The Supreme Court has "read the § 701(a)(2) exception for action committed to agency discretion 'quite narrowly.'"  *Dep't of Commerce*, 139 S. Ct. at 2568 (citation omitted).  The APA expressly contemplates judicial review of an agency's ordinary discretionary judgments by authorizing review of an agency's action for "abuse of discretion."  5 U.S.C. § 706(2)(A).  The § 701(a)(2) exception therefore applies only "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion."  *Heckler*, 470 U.S. at 830.  "Only where there is truly no law to apply have we found an absence of meaningful standards of review."  *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019) (internal quotation marks omitted).

Below, we first consider whether (A) a judicially manageable legal standard governs the agency's exercise of discretion.  We then address Defendants' alternative argument that the agency's withdrawal of the proposed

determination is best characterized as (B) a decision not to take enforcement action.

## A. *Judicially Manageable Legal Standard*

"In order to assess whether the court has a meaningful standard against which to judge the agency's exercise of discretion[,] we first look at the statute itself." *ASSE Int'l*, 803 F.3d at 1069 (cleaned up). "[W]e consider 'the language of the statute and whether the general purposes of the statute would be endangered by judicial review.'" *Pinnacle*, 648 F.3d at 719 (citation omitted).

But "the mere fact that a statute contains discretionary language does not make agency action unreviewable." *Id.* (internal quotation marks omitted). "Even where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion." *ASSE Int'l*, 803 F.3d at 1069 (internal quotation marks omitted). "[W]e 'will find jurisdiction to review allegations that an agency has abused its discretion by exceeding its legal authority or by failing to comply with its own regulations.'" *Id.* (quoting *Abdelhamid v. Ilchert*, 774 F.2d 1447, 1450 (9th Cir. 1985)). In those situations, the agency has chosen to constrain its own discretion via regulations that carry the force of law. *Id.* at 1070. So long as the regulations "provide a 'meaningful standard' by which a court could review the [agency's] actions" and our review of the agency's compliance with those regulations does not "infring[e] any of the [agency's] prerogatives under the statute," then we have jurisdiction, pursuant to the APA, to review the agency's compliance with its own regulations. *Id.* at 1068–69; *see also E. Oakland-Fruitvale Plan. Council v. Rumsfeld*, 471 F.2d 524, 534 (9th Cir. 1972) ("If a statute or regulation establishes a

rule governing the conduct of the agency with respect to an aspect of the agency action, a court may determine whether the agency has complied with that rule.").

"[I]t is only in the context of [the plaintiff's] complaint that we can determine if there is law to be applied in the instant case." *Perez Perez*, 943 F.3d at 864 (internal quotation marks omitted). Here, Plaintiff alleges that the Regional Administrator's withdrawal of the proposed determination violated *both* (1) § 404(c) of the Clean Water Act *and* (2) the agency's implementing regulations. We address each source of law in turn.

### 1. *Section 404(c) of the Clean Water Act*

Congress provided that "[t]he Administrator *is authorized*" to restrict the specification "of *any* defined area . . . as a disposal site, *whenever he determines*, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect" on specified resources. 33 U.S.C. § 1344(c) (emphases added). The statute clearly conveys broad discretion on the Administrator. The Administrator "is authorized," but not required, to restrict an area. *See City and County of San Francisco*, 796 F.3d at 1002 (emphasizing that the statute's use of permissive wording "makes clear that [the agency's decision] is discretionary"). The statute grants authority to the Administrator "whenever he determines" that adverse effects will result, not whenever it can be shown that adverse effects will result. *See Webster v. Doe*, 486 U.S. 592, 600 (1988) (holding that, because the statute authorized the Director of the Central Intelligence Agency to fire an employee "whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States' (emphasis added), not simply when the dismissal *is* necessary or advisable to those interests," the

statute "fairly exudes deference to the Director"). And the number of "any defined [geographical] area[s]" is limitless, suggesting that the agency retains discretion to choose among areas of infinite variation. *Cf. Ctr. for Pol'y Analysis on Trade & Health v. Off. of the U.S. Trade Rep.*, 540 F.3d 940, 945–47 (9th Cir. 2008) (holding that a statutory requirement that a trade group be "fairly balanced" was unreviewable, in part because of the countless perspectives and categories of potential representatives).

Nothing in the statute constrains the Administrator's discretion to initiate a public notice and comment period or, ultimately, to decline to invoke his or her § 404(c) authority.[4] The discretionary judgment as defined by the statute likely "involve[s] balancing a number of considerations, including availability and allocation of agency resources, the predicted outcome of any [investigation], and agency policies and priorities"— considerations that ordinarily are beyond the scope of judicial review. *City and County of San Francisco*, 796 F.3d at 1002.

---

[4] Of course, if the Administrator *does* choose to exercise discretion by restricting the specification of a disposal site, the statute equally plainly constrains that decision. The Administrator may exercise § 404(c) authority only when he or she has determined that a discharge "will have an unacceptable adverse effect." *Id.* Not surprisingly then, courts have reviewed the Administrator's exercise of § 404(c) authority. *E.g.*, *Mingo Logan Coal*, 714 F.3d at 609. But the fact that the agency's decision to exercise § 404(c) authority is governed by a judicially manageable standard does *not* mean that the agency's decision not to exercise that authority necessarily is governed by the same standard. *See Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 989 (9th Cir. 2015) (rejecting the argument that "if there is a manageable standard to review an agency's decision *to exclude*, . . . the same standard can, and should be, used to review an agency's decision *not* to exclude").

Accordingly, we lack jurisdiction to review, for example, a plaintiff's challenge that the Administrator abused his or her discretion by declining to initiate notice and comment with respect to a particular geographical area or, as another example, a plaintiff's challenge that the Administrator abused his or her discretion by declining to determine that discharge into an area "will have an unacceptable adverse effect" pursuant to the statute. The statute grants unfettered discretion to the Administrator to make those decisions. And given the practically limitless number of geographical areas that the Administrator conceivably could consider, subjecting each decision not to invoke § 404(c) could overwhelm the agency's resources and frustrate the statutory purpose of protecting the nation's waters. *See* 44 Fed. Reg. at 58081 (declining to create a formal process for persons to request that the Administrator invoke § 404(c) because, it "might lead to the regional 404 staff being swamped with requests"). We therefore agree with the majority of courts that have held that plaintiffs may not bring *statutory* challenges to the Administrator's decision not to invoke § 404(c). *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, No. CV 14-1667 PSG (CWx), 2014 WL 12923196, at *6 (C.D. Cal. Sep. 26, 2014) (unpublished); *City of Olmstead Falls v. U.S. EPA*, 266 F. Supp. 2d 718, 723 (N.D. Ohio 2003), *aff'd* 435 F.3d 632 (6th Cir. 2006); *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 915 F. Supp. 378, 381 (N.D. Ga. 1995), *aff'd* 87 F.3d 1242 (11th Cir. 1996); *but see All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 8 (D.D.C. 2007) (holding to the contrary after brief analysis).

To the extent that Plaintiff's complaint challenges the Administrator's failure to take action pursuant to the statute, without reference to the agency's implementing regulations, we lack jurisdiction over that challenge. Accordingly, we

affirm the district court's dismissal of Plaintiff's complaint insofar as the complaint rests directly on the Clean Water Act.

## B. *Implementing Regulations*

The statutory grant of unfettered discretion does not end the analysis, though, because Plaintiff's primary challenge is that the EPA failed to comply with its own regulations. We therefore assess whether the pertinent regulations have constrained the agency's discretion by supplying a meaningful legal standard against which to measure the agency's action. *ASSE Int'l*, 803 F.3d at 1069–72.

Title 40 C.F.R. § 231.3 establishes the procedure for issuing a proposed determination. If the Regional Administrator has "reason to believe . . . that an 'unacceptable adverse effect' could result" from specification, he or she "*may* initiate [two] actions:" notifying various parties of the possibility of a proposed determination and publishing notice of a proposed determination, thereby triggering a public comment period. 40 C.F.R. § 231.3(a) (emphasis added).

Notably, 40 C.F.R. § 231.3 tracks the statute's permissive terminology. Nothing requires the Regional Administrator to take any action with respect to a proposed determination; instead, the Regional Administrator "*may* initiate [the specified] actions." *Id.* § 231.3(a) (emphasis added). This step in the regulatory process thus retains the agency's unfettered discretion, and we find no meaningful legal standard that constrains the Regional Administrator's determinations not to take action under § 231.3.

Once the Regional Administrator publishes notice of a proposed determination, however, the regulations impose

mandatory procedural and substantive obligations. Public notice of the proposed determination "shall be given," *id.* § 231.3(b); the notice "shall contain" specified information, *id.* § 231.3(b); the notice "shall . . . be published in the Federal Register" and elsewhere, *id.* § 231.3(d); the agency "shall . . . maintain[] the administrative record", *id.* § 231.4(g); and the administrative record "shall consist" of specified documents, *id.* § 231.5(e). "The Regional Administrator shall provide a comment period," and "[a]ll . . . comments shall be considered." *Id.* § 231.4(a). If the Regional Administrator holds a public hearing, public notice "shall be given," *id.* § 231.4(b); the notice "shall contain" specified information, *id.* § 231.3(b); the notice "shall . . . be published in the Federal Register" and elsewhere, *id.* § 231.3(d); the hearings "shall be" recorded, *id.* § 231.4(c); participants "shall" be afforded "an opportunity for rebuttal," *id.* § 231.4(d); and an additional comment period "shall" be allowed following any hearing, *id.* § 231.4(f).

After the conclusion of the public comment period, any public hearings, and any post-hearing comment periods, the Regional Administrator or his designee "shall" decide whether to withdraw the proposed determination or prepare a recommended determination. *Id.* § 231.5(a). If the Regional Administrator withdraws the proposed determination, then he or she "shall notify" the Administrator and all public commenters of the intent to withdraw the proposed determination, and the public may comment again, this time on whether the Administrator should review the decision. *Id.* § 231.5(c). If the Administrator declines to review the decision, the Regional Administrator "shall give notice" of the withdrawal in the Federal Register, and "[s]uch notice shall constitute final agency action." *Id.* § 231.5(c)(1).

In this case, following the two public comment periods, the Regional Administrator withdrew the proposed determination pursuant to 40 C.F.R. § 231.5(a). The parties' dispute hinges on the proper interpretation of that regulation. Plaintiff reads the regulation as requiring the agency to withdraw a proposed determination only if a legal standard is met: if the discharge of materials is not "likely to have an unacceptable adverse effect." *Id.* The agency reads the regulation as carrying forward the permissive, fully discretionary regime of 40 C.F.R. § 231.3 that applies to the creation of a proposed determination.

At the outset, we note that, when the EPA promulgated the regulation in 1979, it could have chosen either system. Had the EPA stated, for example, that the Regional Administrator may withdraw a proposed determination for any reason or no reason at all, then no meaningful legal standard would apply; the decision would be unreviewable under the APA; and our analysis would be at an end. Similarly, had the EPA stated that the Regional Administrator may withdraw a proposed determination only if an unacceptable effect is unlikely, then a meaningful legal standard would apply; the decision would be reviewable under the APA; and our analysis of reviewability would be at an end.

We must assess, of course, the wording that the EPA actually chose, which is not entirely clear on the point. The dissent's thoughtful analysis presents one plausible interpretation. On balance, however, we conclude that Plaintiff's reading has more support. As discussed below, three factors support Plaintiff's interpretation: the text of the regulation, the structure of the regulations as a whole, and the agency's past practice. None of the factors is dispositive by itself but, taken together, the factors lead us to conclude

that § 231.5(a) directs the Regional Administrator to withdraw a proposed determination only if he or she determines that an unacceptable adverse effect is not likely.

We begin with the text of the regulation:

> The Regional Administrator or his designee shall, [a specified number of days after the expiration of the relevant comment period], either withdraw the proposed determination or prepare a recommended determination to prohibit or withdraw specification, or to deny, restrict, or withdraw the use for specification, of the disposal site because the discharge of dredged or fill material at such site would be likely to have an unacceptable adverse effect.

§ 231.5(a).  Stripped to the essential aspects:  The Regional Administrator "shall . . . either withdraw the proposed determination or prepare a recommended determination . . . because the discharge of dredged or fill material at such site would be likely to have an unacceptable adverse effect."  *Id.*

Read in isolation, a command that "a regulator shall either do X or do Y because pollution levels are unacceptable" implies that the regulator will do X only if pollution levels are acceptable.  The alternative interpretation would allow the regulator to do X for any reason at all, even if pollution levels are unacceptable.  That interpretation may be consistent with formal logic because the regulator chose to do X—full stop.  But the interpretation strains how one ordinarily would understand a command of that sort.  *See Synagogue v. United States*, 482 F.3d 1058, 1061–62 (9th Cir. 2007) ("We begin with the text of the statute, read in its context, and we give undefined terms their

ordinary meanings."); *see also Mohamad v. Palestinian Authority*, 566 U.S. 449, 453 (2012) (declining to read a phrase "unnaturally"). Similarly here, the text of the regulation implies that the Regional Administrator will withdraw a proposed determination only if an unacceptable adverse effect is unlikely.

We emphasize that the inference is not absolute; the text of the regulation, by itself, does not definitively answer the question. For example, consider this hypothetical regulation: "The official shall either reject the permit application or issue the permit because the applicant meets the qualifications." Read in isolation, the sentence implies that the rejection or issuance of the permit hinges on whether the applicant meets the qualifications. But that inference could be rebutted if, for example, the regulations elsewhere specify a cap on the number of permits that may issue regardless of an applicant's qualifications. In that scenario, if the cap had been reached, the official would comply with the literal command of the quoted regulation by rejecting an application despite the applicant's qualifications. In short, although a sentence of this form suggests one reading, the proper interpretation of such a sentence depends on the broader context of the regulation. Here, as we discuss in detail below, the broader context confirms our reading of 40 C.F.R. § 231.5(a).[5]

---

[5] For that reason, we are unpersuaded by the dissent's alternative analogy about visiting a movie theater. The dissent's analogy assumes the wrong context by failing to take account of the fact that the relevant command pertains to the end of a long process directed to gathering pertinent information. Properly contextualized, a relevant analogy would be to someone who has stood in line for 30 minutes wondering if tickets remained for *Citizen Kane*. The directive would be: "Once you've reached the ticket stand, you shall either go home or go to the

Here, the overall structure of the regulatory regime confirms our interpretation. As described in detail above, the regulations use broadly permissive wording when describing the Regional Administrator's actions concerning whether to publish notice of a proposed determination. He or she retains unfettered discretion—the Regional Administrator "*may* initiate [certain] actions." *Id.* § 231.3(a) (emphasis added). But as soon as the Regional Administrator decides to publish a notice of the proposed determination, the regulations then *require* that the Regional Administrator "shall" take many specific actions, *including* a requirement to either withdraw the proposed determination or issue a recommended determination. *Id.* § 231.5(a). Read as a whole, then, the regulations strongly suggest that the Regional Administrator's unfettered discretion to act for any reason whatsoever expires once, and only if, he or she chooses to publish a proposed determination. *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (holding that a mandatory statutory command had a different meaning than nearby permissive commands because "Congress' use of the permissive 'may' in [one subsection] contrasts with the legislators' use of a mandatory 'shall' in the very same section").

It is commonplace in the law for an actor's choice to undertake a wholly discretionary course of action to give rise to a resulting non-discretionary duty that is governed by a manageable legal standard. For example, a person has no duty to undertake a rescue but, once a rescue is attempted, the rescuer is held to a duty of care. *See, e.g.*, Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, *Harper, James*

---

movies because tickets remain for *Citizen Kane*." You could *literally* comply with the command by going home even if tickets are available for *Citizen Kane*, but that is not what the speaker meant.

*and Gray on Torts* §18.6 (3d ed. 2021) ("[T]he undertaking to rescue, although not required, gives rise to the duty to exercise care not to leave the object of the rescue in worse condition than if the rescue had not been attempted."); *Moloso v. Alaska*, 644 P.2d 205, 212 (Alaska 1982) ("It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully." (internal quotation marks omitted)).  The same principle applies with equal force in the context of an agency's regulations.  For example, in *ASSE International*, 803 F.3d at 1069–71, we held that, although the relevant agency had full discretion to create—or not—exchange visitor programs, the agency's unfettered discretion ended when it chose to create a program; the agency's regulations imposed mandatory, judicially reviewable duties on the agency in the administration of an exchange program already created.

We read the regulatory regime here to follow that same pattern.  The agency chose to retain full discretion ("may initiate") when deciding whether to start the regulatory process, and it chose to constrain its discretion ("shall") after its decision to issue a proposed determination and to call for public comments specifically on the likelihood of adverse effects.[6]

---

[6] Defendants argue that a different regulation, 40 C.F.R. § 231.6, supports their interpretation of § 231.5.  Section 231.6 describes the procedures that the Administrator must follow if he or she chooses to review the Regional Administrator's decision.  In particular, § 231.6 requires the Administrator to "state the reasons for [his or her] final determination."  Defendants urge us to conclude that, because § 231.5 does not contain a similar statement, the agency must have empowered the Regional Administrator to act without any reason at all.  We disagree.  Section 231.6 simply paraphrases the statutory text, which requires that

Finally, our interpretation is consistent with the agency's past practice. *Cf. Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 556–58 (9th Cir. 2011) (examining an interpretation of a statute for consistency with the past practice of relevant agencies). In the only previous withdrawal of a proposed determination, concerning a project to place gravel on tundra wetlands in 1991, the Regional Administrator nowhere suggested that her authority to withdraw could rest on anything other than a conclusion that any effects were likely acceptable. 56 Fed. Reg. at 58247. Instead, she explained:

> Region 10 based initiation of 404(c) proceedings on its belief that the project could have unacceptable adverse impacts on wildlife and wildlife habitat. *The revised project*, however, represents a significant reduction in scope and *is environmentally acceptable to EPA* for the following [seven] reasons [pertaining to effects on the environment].

*Id.* (emphases added).

Because there is only one previous withdrawal of a proposed determination, we readily acknowledge that this factor does not weigh heavily in our analysis. But we also

---

"[t]he Administrator shall set forth . . . his reasons for making any determination under this subsection." 33 U.S.C. § 1344(c). Section 231.6 makes clear that the Administrator may not silently affirm the Regional Administrator's reasons for invoking § 404(c) but, instead, and consistent with the statutory text, must provide his or her *own* reasons for any final determination. The requirement that the Administrator provide his or her own reasons does not imply that the Regional Administrator may act without reason.

do not consider past practice entirely irrelevant. The fact that the agency's previous withdrawal was due to its reassessment of environmental effects supports our view that the regulations contemplate precisely that inquiry.

For all of those reasons, we conclude that § 231.5(a) allows the Regional Administrator to withdraw a proposed determination *only* if the discharge of materials would be unlikely to have an unacceptable adverse effect. The agency has defined an "unacceptable adverse effect" to encompass "significant" effects on specified resources. 40 C.F.R. § 231.2(e). That legal standard is akin to many other standards that we regularly review under the APA. *See, e.g.*, *Bair v. Cal. Dept. of Transp.*, 982 F.3d 569, 577–81 (9th Cir. 2020) (reviewing, pursuant to the APA, an agency's "finding of no significant impact" under the National Environmental Policy Act of 1969); *Helping Hand Tools v. U.S. Env. Prot. Agency*, 848 F.3d 1185 (9th Cir. 2016) (reviewing, pursuant to the APA, the EPA's granting of a "prevention of significant deterioration" permit under the Clean Air Act).

Nor does judicial review of the EPA's compliance with its own regulations threaten to "infring[e] any of the [agency's] prerogatives under the statute." *ASSE Int'l*, 803 F.3d at 1069. The EPA remains free to consider—or not—the suitability of invoking its § 404(c) authority with respect to any given geographical area. Both the statute and the first steps in the regulations, 40 C.F.R. § 231.3(a), grant the agency unfettered discretion. But once the Regional Administrator publishes a proposed determination and triggers a public comment period, the agency must, under its own regulations, decide what next step to take depending on the likelihood of unacceptable effects. As noted above, the number of potential geographical areas is effectively limitless, and subjecting the EPA to judicial review with

respect to every conceivable area could overwhelm the agency's resources. By sharp contrast, the agency has withdrawn a proposed determination after its discretionary decision to initiate a period of public comment only *twice* in a half-century. *See* 44 Fed. Reg. at 58079 (predicting, accurately, that "EPA does not expect that the 404(c) authority will be used very often"). Judicial review in those rare instances, the frequency of which remains fully within the agency's control, poses no threat to the agency's statutory prerogatives.

In conclusion, even though the statute contains a broad grant of discretion, the agency's regulations contain a meaningful legal standard governing the Regional Administrator's withdrawal of a proposed determination. Accordingly, the decision is subject to judicial review under the APA. *See, e.g.*, *ASSE Int'l*, 803 F.3d at 1069 (holding that, although the statute contains no meaningful standard constraining the State Department's discretion, the plaintiff "has asked us to measure the State Department's administration of the [program] against the Department's own regulations. This we can do without infringing any of the State Department's prerogatives under the statute."); *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1161 (9th Cir. 2004) ("While [the relevant statute], on its face, gives the Attorney General discretion, the Alcarazes' argument is that this discretion has been legally circumscribed by various memoranda through which the [agency] implemented its . . . policy. Under these circumstances, we find that statute is not drawn in such broad terms that there is no law to apply."); *Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003) (holding that, even though "no statute or regulation specifically govern[ed]" the petitioner's application to the agency, meaningful law nevertheless existed because the application was "analogous, at least to

some degree, to a motion to reopen, which is governed by a clear set of rules and regulations"); *see also County of Esmeralda v. U.S. Dept. of Energy*, 925 F.2d 1216, 1219 (9th Cir. 1991) (holding that, although the statute provided no express legal standard, we could review the agency's decision because, logically, "a judicially manageable standard . . . readily presents itself," and because we could not "see how the purposes of the Act will be endangered by judicial review of the type of action at issue here"). This case thus differs from precedents in which neither the relevant statute *nor any regulation* provided a meaningful legal standard. *See, e.g.*, *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1072–73 (7th Cir. 2020) (holding, after concluding that the statute contained no meaningful standard, that the plaintiff "does not point to any regulations governing the [agency's decision]. We searched too and came up empty, finding no statute, regulation, or guideline [on point]."); *City and County of San Francisco*, 796 F.3d at 1002–03 (holding that the statute contained no meaningful standard and not mentioning any pertinent regulation); *Pac. Gas & Elec. Co. v. FERC*, 464 F.3d 861, 867 (9th Cir. 2006) (same); *Sierra Club v. Whitman*, 268 F.3d 898, 902–05 (9th Cir. 2001) (same); *Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 938 (9th Cir. 1987) (same). Nor do we hold that a permissive standard that applies to one type of decision necessarily applies equally (and in reverse) to an opposite decision, *Bear Valley*, 790 F.3d at 989; instead, we hold that the agency intended the mandatory legal standard to apply specifically and directly to decisions to withdraw a proposed determination.

We hasten to add that the Regional Administrator retains significant discretion—of the ordinary variety—when making a determination under § 231.5(a). Reviewability does not mean that the agency has no discretion at all. *ASSE*

*Int'l*, 803 F.3d at 1071. Whether "unacceptable" adverse effects are "likely" is a flexible standard that draws considerably on the agency's expertise and judgment. *Cf.* 44 Fed. Reg. at 58078 ("[W]hat is required is a reasonable likelihood that unacceptable adverse effects will occur—not absolute certainty but more than mere guesswork."). On remand, the district court must accord "the proper deference" to the agency's decision on the merits when applying the APA's standards of review. *ASSE Int'l*, 803 F.3d at 1071.

We briefly offer several observations in response to the dissent's speculation of potential policy implications of our decision. Dissent at 54–56. As an initial matter, we are tasked with deciding the legal question before us: Is the agency's action reviewable? Policy implications play no role in that analysis. Whatever the policy implications may be from our decision, those implications do not influence whether or not the agency's withdrawal here is reviewable.

The dissent also appears to conflate reviewability with a particular outcome. We repeat what we stated before: nothing in our opinion affects whether the agency's withdrawal here violated the APA. In particular, nothing in our decision speaks to the factors that are relevant when assessing the likelihood of unacceptable effects. In cases in which the agency acts *after* a permit has been issued and the discharge of materials has begun, such as in *Mingo Logan Coal Co.*, 714 F.3d at 610–11, the likelihood of unacceptable effects almost certainly hinges solely on a technical or scientific judgment about the effects of the discharge. But in cases in which the agency acts *before* a permit has been issued, the likelihood of unacceptable effects also could depend on the Regional Administrator's prediction as to the scope of any permit that the Corps would approve. That

assessment, in turn, could rest on the EPA's predicted ability
to influence the permitting process to avoid an unacceptable
effect, for example, because of procedural protections that
the Corps has afforded to the EPA.  Nothing in our opinion
addresses whether the Regional Administrator must assess
stale technical data in the face of a revised permit
application, or whether he or she must disregard any
pertinent procedures that bind the relevant agencies.  We
leave the merits determination solely for the district court's
analysis on remand.

Finally, we are doubly puzzled by the dissent's hand-
wringing about the agency's being hamstrung by an earlier
action by that agency under a different administration.
Agencies take action all the time, for instance by issuing
final rules, that bind the agency for the future, regardless of
a change in philosophy or personnel.  Moreover, our holding
that courts may review a withdrawal of a proposed
determination rests entirely on our interpretation of the
agency's regulation.  If the EPA disapproves of our
interpretation of § 231.5(a), it is free to change the rule
through ordinary rule-making.  As noted above, if the
regulation granted unfettered discretion to the Regional
Administrator to withdraw a proposed determination, then
the decision would be unreviewable under the APA.

## B.  *Decision Not to Take Enforcement Action*

Defendants argue, in the alternative, that the withdrawal
of the proposed determination here is best characterized as
an agency's decision not to take enforcement action.  An
agency's decision not to take enforcement action is
presumptively unreviewable, but that presumption may be
overcome if a meaningful legal standard constrains the
agency's discretion. *Heckler*, 470 U.S. at 831–33.  Because
we have concluded that the agency's implementing

regulations clearly contain a meaningful legal standard, regardless of the presumption of reviewability or unreviewability, our decision does not turn on the proper characterization of the agency's action.

In any event, with respect to Plaintiff's challenge to the agency's compliance with its regulations, the agency's decision is not properly characterized as a decision not to take enforcement action. *See City and County of San Francisco*, 796 F.3d at 1001–02 (summarizing the factors that determine how to characterize an agency's action). The Regional Administrator must base his or her withdrawal decision on the likelihood of unacceptable effects, not on "allocation of resources" or on "agency policies and priorities." *Id.* at 1002. Unlike ordinary non-enforcement actions, the agency's withdrawal here has a real-world legal effect of removing the prohibition on the Corps' authority to issue a permit. *Id.*; 33 C.F.R. § 323.6(b); 40 C.F.R. § 231.3(a)(2). Finally, withdrawal of a proposed determination is not akin to the exercise of "prosecutorial discretion, an arena in which courts have traditionally not interfered." *City and County of San Francisco*, 796 F.3d at 1002. Unlike the private, discretion-laden charging decisions made by a prosecutor, the EPA's withdrawal of a proposed determination is the culmination of reasoned, public decisionmaking, following a formal period of public comment and hearings.

**AFFIRMED in part, REVERSED in part, AND REMANDED.** The parties shall bear their own costs on appeal.

BRESS, Circuit Judge, dissenting:

Sometimes there really is just no law to apply. In administrative law, there is nothing for courts to do when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). That venerable principle should have easily answered this case. Yet from a Clean Water Act scheme that the majority concedes gives EPA unfettered discretion, our court purports to discover a judicially enforceable standard for reviewing EPA's decision to withdraw an initial exploratory determination—which is itself merely an early-stage decision to cease pursuing a purely discretionary enforcement mechanism.

The majority opinion turns on a serious misreading of the governing regulations, rewriting the rules that EPA set for itself and inserting courts into what was supposed to be the preliminary stages of a discretionary agency review process. Though the mine at the center of this case is a source of great public controversy, the administrative law question here should have been straightforward. The agency's withdrawal from its discretionary exploratory process is not subject to judicial review. I thus respectfully dissent.

I

The Administrative Procedure Act, we all agree, "embodies a 'basic presumption of judicial review.'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2567 (2019) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967)). But "[t]his is just a presumption." *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) (quotations omitted). It is rebutted when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

The classic example of such discretionary action is "an agency's decision not to institute enforcement proceedings." *Lincoln*, 508 U.S. at 191. That type of agency decision is in fact "presumptively *unreviewable*." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (emphasis added). But more broadly, § 701(a)(2) precludes judicial review "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion." *Id.* at 830. In that situation, we lack jurisdiction to review the agency's decision. *See, e.g.*, *Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir. 2004) ("Under the Administrative Procedure Act, we lack jurisdiction to review agency actions that are committed to agency discretion by law." (quotations omitted)).

No one doubts that § 701(a)(2) is a "narrow exception" to our usual ability to review final agency actions. *City & County of S.F. v. U.S. Dep't of Transp.*, 796 F.3d 993, 1002 (9th Cir. 2015) (quotations omitted). But nor is that exception without import or content, either. There are numerous cases in which the Supreme Court and our court (to say nothing of other courts) have deemed agency action unreviewable because it was committed to the agency's discretion. *See, e.g.*, *Lincoln*, 508 U.S. at 184, 193; *Webster v. Doe*, 486 U.S. 592, 600–01 (1988); *Heckler*, 470 U.S. at 836–38; *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 953–54 (9th Cir. 2017); *City & County of S.F.*, 796 F.3d at 1002; *Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Com.*, 792 F.3d 1027, 1035 (9th Cir. 2015); *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 989–90 (9th Cir. 2015); *Ctr. for Policy Analysis on Trade & Health (CPATH) v. Off. of U.S. Trade Representative*, 540 F.3d 940, 946–47 (9th Cir. 2008), *as amended* (Oct. 8, 2008); *Pac. Gas & Elec. Co. v. FERC*, 464 F.3d 861, 867 (9th Cir. 2006); *Sierra Club v. Whitman*, 268 F.3d 898, 903–05 (9th Cir.

2001); *Helgeson v. Bureau of Indian Affs., Dep't of Interior*, 153 F.3d 1000, 1003 (9th Cir. 1998).

The case before us should have made a fine addition to this string citation.

## A

The Clean Water Act generally prohibits the discharge of dredged or fill materials into navigable waters without a permit. 33 U.S.C. §§ 1311(a), 1344(a). This case centers on § 404 of the Act, which concerns the permitting process. *Id.* § 1344. The Army Corps of Engineers is responsible for issuing permits for specified disposal sites, known as "specifications." *Id.* § 1344(a)–(b), (d).

For our purposes, the key provision of the Act is § 404(c), which provides that the EPA Administrator "is authorized" to prohibit, deny, or restrict a specification "whenever he determines" that the discharge of materials "will have an unacceptable adverse effect" on the water or surrounding wildlife. *Id.* § 1344(c). The question presented here is whether courts can review EPA's decision to *withdraw* a *proposed* determination to further explore using its discretionary § 404(c) powers. The answer is clearly no.

My fine colleagues in the majority readily agree that EPA's decision to initiate the § 404(c) process is fully discretionary, contains no meaningful legal standard, and is therefore not subject to judicial review. That is entirely correct given the statute's permissive language. Indeed, EPA's decision not to proceed with a § 404(c) review looks exactly like a traditionally unreviewable non-enforcement decision. *See Heckler*, 470 U.S. at 832–33. It involves the classic balancing of policy considerations—cost-benefit analyses, agency priorities, and allocation of governmental

resources—that commonly exceed judicial review.  *See City & County of S.F.*, 796 F.3d at 1001–02; *Pacific Gas & Elec.*, 464 F.3d at 867.  The majority thus forthrightly "agree[s] with the majority of courts that have held that plaintiffs may not bring *statutory* challenges to the Administrator's decision not to invoke § 404(c)."

EPA's implementing regulations unsurprisingly have the same discretionary cast as the statute they serve.  Under 40 C.F.R.  § 231.3(a),  "*[i]f* the Regional [EPA] Administrator has reason to believe . . . that an 'unacceptable adverse effect' could result from the specification" of a disposal site, he "*may initiate*" certain sequential actions.  The Regional Administrator will notify interested parties that he "intends to issue a public notice of a *proposed determination*" to prohibit or restrict the specification.  *Id.* § 231.3(a)(1) (emphasis added).  And if within 15 days of the notice "it has not been demonstrated to the satisfaction of the Regional Administrator that no unacceptable adverse effect(s) will occur," or that corrective action will be taken, the Regional Administrator "shall publish notice of a *proposed determination* in accordance with the procedures of this section." *Id.* § 231.3(a)(2) (emphasis added).

A "proposed determination" merely reflects the initial stage of a potential § 404(c) prohibition that EPA might decide to issue later down the road, should the § 404(c) process run its full course.  As EPA explained in the preamble to its § 404(c) regulations, "a proposed determination does not represent a judgment that discharge of dredged or fill material will result in unacceptable adverse effects; it merely means that the Regional Administrator believes that the issue should be explored." *Denial or Restriction of Disposal Sites; Section 404(c) Procedures*, 44 Fed. Reg. 58,076, 58,082 (Oct. 9, 1979).

When it comes to initiating the "proposed determination" process under the regulations, we thus again find agency action committed to the agency's discretion. The majority concedes this same point. The majority opinion recognizes that 40 C.F.R. § 231.3 "tracks the statute's permissive terminology," so that "[t]his step in the regulatory process thus retains the agency's unfettered discretion." The majority then correctly concludes that there is "no meaningful legal standard that constrains the Regional Administrator's determinations not to take action under § 231.3." For the same reasons explained as to the statute itself, § 231.3's permissive language and the balancing of agency priorities it reflects make the Regional Administrator's decision whether to proceed with a proposed determination the very type of quasi-enforcement decision that is committed to the agency's discretion.

Once the Regional Administrator decides to publish notice of a proposed determination, however, he must follow certain procedures for public notice in 40 C.F.R. § 231.3(b)–(d). He must also provide a public comment period and permit comments "directed to whether the proposed determination should become the final determination and corrective action that could be taken to reduce the adverse impact of the discharge." *Id.* § 231.4(a). The regulations set out further guidelines for when the Regional Administrator should hold public hearings on the issue and the procedures that govern those hearings. *Id.* § 231.4(b)–(g).

Once the public comment period has concluded, the Regional Administrator must act within certain time frames to either "withdraw" his proposed determination or to move forward with preparing a "recommended determination" to prohibit or limit the specification. *Id.* § 231.5(a). When the decision is to withdraw the proposed determination, the

Regional Administrator must notify the EPA Administrator (*i.e.*, the Regional Administrator's boss), who may decide to review the withdrawal. *Id.* § 231.5(c)(2). If the Regional Administrator withdraws the proposed recommendation and the Administrator elects not to review it, the process ends. *Id.* § 231.5(c)(1). If, however, the Regional Administrator prepares a "recommended determination" to prohibit or limit the specification, the Administrator must then review that. *Id.* §§ 231.5(a)–(b), 231.6. That can, in turn, lead to a final decision by the Administrator that prohibits or limits the specification, *id.* § 231.6—the ultimate exercise of EPA's § 404(c) power.

In the case before us, and before any permit application for the Pebble Mine had even been submitted, the Regional Administrator in 2014 issued a "proposed determination" on the Pebble Mine and followed the required procedures for public notice and comment. But in 2019, he then decided to "withdraw" the proposed determination, concluding that based on "the passage of time, the submittal of a permit application, and a significant expansion of the record, [the proposed determination] has effectively grown stale." 84 Fed. Reg. 45,749, 45,753 (Aug. 30, 2019).

In particular, the Regional Administrator pointed to at least six significant differences between the anticipated mining proposal that EPA had evaluated in 2014 in issuing its proposed determination, and the project's then-current proposal in 2019. *Id.* The Regional Administrator determined that "it is more appropriate to use well-established mechanisms to raise project-specific issues as the record develops during the permitting process and consider the full record before potential future decision-making on this matter, instead of maintaining a section 404(c) process that is now five years old and does not

account for the voluminous information provided in the permitting process." *Id.* Nevertheless, the Regional Administrator reserved the right to initiate "a new section 404(c) process that is informed by the entirety of the facts and the Corps' decision-making known to the Agency." *Id.* at 45,755.

The EPA Administrator then declined to review the withdrawal—which plaintiff Trout Unlimited now claims is subject to judicial review.

B

One would have thought that in the context of purely discretionary statutory authority to launch the § 404(c) process and EPA implementing regulations that give the Regional Administrator unreviewable discretion whether to initiate the "proposed determination" exploratory mechanism, a decision to *withdraw* a proposed determination would also be committed to the agency's discretion. Alas, we learn today that is not true.

According to the majority, there is a judicially manageable standard to review that action, which is effectively a refusal to act. We are told that standard is to be found in 40 C.F.R. § 231.5(a), which provides:

> The Regional Administrator or his designee shall [within specified time periods] . . . either withdraw the proposed determination or prepare a recommended determination to prohibit or withdraw specification, or to deny, restrict, or withdraw the use for specification, of the disposal site because the discharge of dredged or fill material at such

> site would be likely to have an unacceptable
> adverse effect.

*Id.* This provision indicates that the Regional Administrator may move forward with a "recommended determination" based on the finding that the discharge of material "would be likely to have an unacceptable adverse effect." *Id.* But the majority concludes that a *withdrawal* of a proposed determination nevertheless requires the Regional Administrator to determine that a specification is *not* likely to have an unacceptable adverse effect.

The majority's twisted inversion of the regulation is clearly wrong. The "*unacceptable* adverse effect" standard applies if the Regional Administrator decides to *prepare* a *recommended determination* to prohibit or restrict a specification. The regulation makes clear that this is the only permissible basis for taking such an action toward stopping or limiting a specification—even as nothing in the regulation requires the agency to take that action, either.

But the regulation obviously does not say, as the majority nevertheless holds, that the Regional Administrator can only *withdraw* a proposed determination based on the opposite finding of "*no* unacceptable adverse effect." The regulation provides no standards whatsoever for such a decision to pull back. And it thus places no judicially enforceable limits on the Regional Administrator's ability to withdraw. 5 U.S.C. § 701(a)(2); *Heckler*, 470 U.S. at 830. The majority has invented a legal standard that does not exist in the statute or regulations.

The majority's analysis in reaching that result is deeply flawed. The majority opinion reasons that "[a] command that 'a regulator shall either do X or do Y because pollution levels are unacceptable' implies that the regulator will do X

only if pollution levels are acceptable." This is a highly precarious proposition on its face, and it finds no support in language, logic, or law. In fact, we refused to credit a substantially similar mirror image argument in *Bear Valley Mutual Water Co. v. Jewell*, 790 F.3d 977 (9th Cir. 2015), rejecting as "unavailing" the claim that "if there is a manageable standard to review an agency's decision *to exclude*, . . . the same standard can, and should be, used to review an agency's decision *not* to exclude." *Id.* at 989.

The majority's stylized rendering of the regulation—"do X or do Y because pollution levels are unacceptable"—also fails to account for the nature of the agency decision before us. The "X" here is a decision to pull back, *i.e.*, to *not proceed with something*. If I say, "you shall either not go to the movies or go to the movies because *Citizen Kane* is showing," you would violate my directive if you went to the movies to see *Sunset Boulevard*. But you may of course decide *not to go* to the movies for any reason; I have placed no limits on your discretion. Certainly, nothing about my instructions would suggest you may not go to the movies only if *Citizen Kane* is *not* showing.[1]

---

[1] The majority claims that the more "relevant analogy would be to someone who has stood in line for 30 minutes wondering if tickets remained for *Citizen Kane*," so that, in its view, the more comparable directive would be: "Once you've reached the ticket stand, you shall either go home or go to the movies because tickets remain for *Citizen Kane*." This little debate underscores as much as anything how far the majority has reimagined the regulatory text. The majority's reworked *Citizen Kane* hypothetical simply bakes in its conclusion, namely, that the presumptive point of the proposed determination process is to move forward with a recommended determination absent a particular finding. Unlike the majority's hypothetical of a moviegoer waiting in line—who obviously has a dedicated objective of seeing the movie—the proposed determination process is exploratory in nature and embodies no such

The majority asserts that my position, while concededly "consistent with formal logic," "strains how one ordinarily would understand a command" like the one in 40 C.F.R. § 231.5(a). But I am at a loss to understand how the majority can say this, as the language and logic work together. Section 231.5(a) imposes a condition for the agency if it wants to move forward, but no condition for stopping the process. The Regional Administrator "shall . . . either withdraw the proposed determination or prepare a recommended determination because the discharge of dredged or fill material at such site would be likely to have an unacceptable adverse effect." 40 C.F.R. § 231.5(a). This certainly does not "impl[y]," as the majority holds, "that the Regional Administrator will withdraw a proposed determination only if an unacceptable adverse effect is *unlikely*." (Emphasis added.) That untenable interpretation should be equally unpalatable to the logician and linguist alike.

Of course, not even the majority is willing fully to embrace its own inside-out theory of judicially manageable standards, which would conflict with our decision in *Bear Valley*. The majority thus quickly cautions that the inverted inference it draws from the regulatory text "is not absolute" because "the proper interpretation of such a sentence depends on the broader context of the regulation." I of course agree we should interpret regulatory text in context. But the context plainly supports the government.

---

foreordained objective. That explains why under the regulation as written, no legal standard governs the agency's ability to withdraw a proposed determination, and why the agency need not initiate the § 404(c) process at all.

As the majority itself holds, the decision to withdraw a proposed determination takes place in the *context* of EPA's wholly discretionary (and thus unreviewable) decision to initiate the § 404(c) process, and wholly discretionary (and, again, unreviewable) decision to initiate the "proposed determination" sub-process. Nothing about this overall framework suggests that a decision to abandon an exploratory first stage in the process should suddenly be subject to judicial oversight. The majority implies it would be a scandal if the Regional Administrator could withdraw a proposed determination "for any reason at all." But that discretion is entirely consistent with what the majority acknowledges is the "unfettered discretion" that otherwise pervades the entire § 404(c) scheme.

Absent a judicially manageable standard, as here, a decision to withdraw a proposed determination, no less than a decision to initiate one, involves the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise, such as allocation of resources and agency policies and priorities." *City & County of S.F.*, 796 F.3d at 1001–02 (quotations omitted). EPA's withdrawal decision in this case—which cited changed circumstances, the ability to use other regulatory devices, and a desire to reconsider the matter based on a more accurate record, 84 Fed. Reg. 45,753–55—reflects typical reasoning that agencies employ in setting prerogatives.

EPA's withdrawal decision may have been lousy, prudent, or somewhere in between. But there is no legal standard in the statute or regulations by which to form that judgment. *See Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1073 (7th Cir. 2020) (concluding in the context of a similar Clean Water Act scheme that "in the absence of any regulation addressing the basis for the

decision to withdraw an objection, the choice is as committed to the agency's discretion as the decision to object in the first instance"). It is a strange world indeed when an agency's withdrawal of an exploratory effort to consider a purely discretionary enforcement decision turns out to be agency action that is not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

C

Given the overall scheme, it follows that the majority errs in concluding that the "broader context of the regulation" somehow supports its effort to wring from the regulation a legal standard it does not contain. The majority opinion reasons that "as soon as the Regional Administrator decides to publish a notice of the proposed determination, the regulations then *require* that the Regional Administrator 'shall' take many specific actions, *including* a requirement to either withdraw the proposed determination or issue a recommended determination." From this the majority deduces that "the regulations strongly suggest that the Regional Administrator's unfettered discretion to act for any reason whatsoever expires once, and only if, he or she chooses to publish a proposed determination."

The majority's conclusion does not follow. Once the Regional Administrator publishes a notice of proposed determination, there are indeed requirements that then apply. *See* 40 C.F.R. §§ 231.3(b)–(d), 231.4. But those requirements are entirely *procedural* (and there is no suggestion that EPA here failed to follow them). That an agency's discretionary decision-making process is subject to mandatory procedural rules says nothing about whether there is a substantive, judicially manageable standard by which to evaluate agency action.

Indeed, we have never held that procedural requirements have any necessary bearing on whether an agency's substantive decision is reviewable. In *International Brotherhood of Teamsters v. U.S. Dep't of Transportation*, 861 F.3d 944 (9th Cir. 2017), for example, the agency was required to conduct a pilot program before issuing certain long-haul trucking permits. *Id.* at 953. The pilot program was subject to a slew of procedural requirements. *Id.* Yet we held that the statute "provides 'no meaningful standard against which to judge the agency's exercise of discretion' in interpreting the data generated through the pilot program and granting long-haul operating permits." *Id.* at 954 (quoting *Heckler*, 470 U.S. at 830).

Citing no authority (I do not count the highly inapposite discussion of the common law duty to rescue), the majority has merely taken the entirely commonplace situation of procedural rules that govern otherwise discretionary agency decision-making, and then bootstrapped those rules into support for a non-existent judicially manageable substantive standard. The careful reader should thus not be taken in by the majority's discourse on the use of word "shall" in 40 C.F.R. § 231.5. The regulations use the word "shall" to denote mandatory *procedural* obligations. "Shall" does no more work than this. The requirement that the Regional Administrator *shall* make a decision within a certain amount of time says nothing about *the basis* by which he should make that decision.[2]

---

[2] The majority therefore seriously errs in suggesting that *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059 (9th Cir. 2015), supports some broader "principle," apparently analogous to the common law duty to rescue, under which a decision to undertake a discretionary action then necessarily triggers a judicially manageable standard. In *ASSE*,

The majority makes a similar error of law in relying on another contextual feature of the § 404(c) regulations, which is that "the relevant command pertains to the end of a long process directed to gathering pertinent information." Once again, the majority provides no legal support for the suggestion that public comment periods or an information-gathering process inform whether there exists a judicially reviewable legal standard. As with procedural rules that govern the timing of otherwise discretionary decisions, public comment periods are ubiquitous in agency regulations. But courts have routinely held that agency action was committed to agency discretion notwithstanding the substantial information-gathering processes that may precede them. *See, e.g.*, *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1029, 1031–33 (D.C. Cir. 2007); *Bear Valley*, 790 F.3d at 985, 989–90.

Finally, the majority errs in claiming that its interpretation is "consistent with the agency's past practice." The "past practice" referenced here is nothing of the sort, as the majority effectively recognizes by "readily acknowledg[ing] that this factor does not weigh heavily in [its] analysis." As the majority concedes, EPA has withdrawn a proposed determination only *one* other time—

---

regulations permitted the agency to issue a sanctions order if it made one of four substantive findings. *Id.* at 1071. The agency issued such an order, and the aggrieved party challenged that decision. *Id.* ASSE was a standard-issue decision in this area of administrative law. It is therefore unsurprising that the regulations at issue in *ASSE*—which contained defined legal standards—are in no way comparable to the regulations at issue here, which lack any standard for the withdrawal of an exploratory proposed determination. *ASSE* would be analogous if EPA issued a § 404(c) determination prohibiting a dredging project, *see* 33 U.S.C. § 1344; 40 C.F.R. § 231.6, and the regulated entity had challenged that decision. But that is not this case.

*in 1991.* And while in that case the Regional Administrator determined that withdrawal was appropriate because the reduced scope of the project mitigated the environmental effects, the agency in that one instance certainly did not take the position that a withdrawal could be justified only on that basis. *See* 56 Fed. Reg. 58,247, 58,247 (Nov. 18, 1991).

So, we are left with this: an improper textual inference that is "not absolute" plus past agency practice that "does not weigh heavily in our analysis" plus "contextual" features (like mandatory procedural rules) that commonly accompany discretionary agency decision-making somehow produce a legal standard capable of judicial review. That is quite mistaken. There is nothing in the statute, regulations, or past agency practice that creates a judicially manageable standard for evaluating EPA's decision to withdraw a proposed determination under 40 C.F.R. § 231.5(a). In concluding otherwise, the majority has imposed a legal standard that neither Congress nor EPA saw fit to enact.

## II

And to what end? The incentives that today's decision creates are troubling to say the least. Contrary to the evident balance struck in the statute and implementing regulations, the court's decision today will vastly increase the costs of EPA initiating the § 404(c) process. And that inevitable consequence is likely, over time, to earn the disdain of those on all sides of the push and pull between environmental protection and commercial development.

We can imagine how this will play out. An EPA that is more inclined toward environmental protection will now find it strategically beneficial to more frequently initiate the § 404(c) proposed determination process. Doing so will allow it to bind future EPAs that may be more favorable to

industry, and that, under today's decision, will now need to show a likelihood of "no adverse environmental effects" to get out from under the proposed determinations of their predecessors.[3]

Conversely, an EPA that is more solicitous of commercial development will now be less likely to initiate the proposed determination process, when such a decision cannot be as easily undone. Before today's decision, such an EPA might have found the proposed determination process attractive because it could allow tentative exploration, without commitment, into whether a specification could cause undue environmental harm. An EPA with that orientation could also use the proposed determination device as leverage to achieve more limited changes in a specification, without the "sledgehammer" option of a full § 404(c) prohibition. But now the proposed determination exploratory process comes with a serious dilemma: it can only be withdrawn based on a finding of a lack of environmental harm—a finding that, if EPA makes it, is sure to tie the agency up in years of ancillary litigation.

This case proves that point. EPA issued its proposed determination here in 2014. After many intervening events and changes to the Pebble Mine proposal, EPA withdrew its proposed determination in 2019. Now, in 2021, and after yet further developments involving the mine project in the nearly two years since, EPA is now told that its 2019 withdrawal was proper only if it could be explained on the ground that the discharge of materials would be unlikely to

---

[3] The majority notes that an agency can also bind its successors by issuing final rules. But promulgating a final rule is a substantial, costly undertaking, whereas issuing a notice of a proposed determination is an exploratory action that can be initiated with far less cost and process.

have an unacceptable adverse effect. A considerable amount of agency and judicial resources have been (and will be) devoted to what is ultimately EPA's decision not to exercise a discretionary power.

The majority's confusing discussion of what the district court and agency are supposed to do on remand only compounds the problem. The majority maintains that "nothing in our opinion affects whether the agency's withdrawal here violated the APA." That statement is difficult to comprehend when the EPA did not base its withdrawal decision on the likelihood of no adverse unacceptable adverse environmental effects, which is the legal standard we are told applies here. To the extent the majority is now suggesting that EPA could still consider other factors (like "procedural protections"), the majority has only muddied the legal standard it created. All that is guaranteed here is further litigation over the meaning of today's decision and the obligations it imposes.

Those who wish to stop developments like the Pebble Mine will no doubt applaud this result. But that constituency will surely be displeased when an EPA less inclined toward their views decides that initiating the otherwise discretionary § 404(c) process now comes at too great a price. The majority's opinion can thus only result in greater extremism in environmental policy. Our political branches could of course choose that path for themselves. But it was not for us to impose it on them.

The agency withdrawal decision here was clearly agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Our court errs in holding otherwise. I respectfully dissent.